110 So.2d 703 (1959)
Merton J. CUSHMAN et al., Appellants,
v.
Alvin SCHUBERT, Appellee.
No. 574.
District Court of Appeal of Florida. Second District.
April 8, 1959.
*704 Albert P. Schwarz, of Sanders, McEwan, Schwarz & Mims, Orlando, for appellants.
Joel Wells, Jr., of Maguire, Voorhis & Wells, Orlando, for appellee.
JAMES R. KNOTT, Associate Judge.
This appeal is from a case which arose out of an involved series of transactions relating to the purchase of a large tract of land near Orlando. Only a relatively brief synopsis of the facts will be set out here.
It appears that appellee, plaintiff below, moved to Florida in January, 1954, being previously in the building and developing business in Ohio. Soon after arriving in Orange County he met W.S. Murchison, who was the owner of a 700 acre tract of land outside of Orlando, and thereafter entered a contract with him and one Ledman to develop this land. The costs and profits were to be divided equally. Plaintiff proceeded to improve the property, expending over $25,000 thereon, but his partners both failed to raise their share of the expenses and the development operations ceased when plaintiff ran out of funds. Thereafter plaintiff contacted one William Haynie and arranged for him to furnish the additional needed capital and share in the profits; however, this arrangement was also terminated, upon the death of Haynie's wife.
In his search for capital plaintiff next came in contact with the defendants, Merton J. Cushman and V.K. Cushman, and together with one Aaron Brown the parties entered into a third contract contemplating the development of Murchison's land. The Cushmans were to locate the capital for the venture, but failed to do so for several months. They then succeeded in getting one Cohen and Robert Brown to join them in the venture; however, as Cohen was to put up the bulk of the capital a new arrangement was necessary with plaintiff, as the agreement between him, the Cushmans and Aaron Brown contemplated a straight 25% of the profits for each. The deal was to be handled through the defendant, B.C.C. Corporation, which was owned by Cohen, the Cushmans and Robert Brown, so plaintiff signed a contract with B.C.C. which acknowledged the money invested and services rendered by plaintiff, and which provided that he would be paid $100 for each house built on the property and sold, and 5% of the total purchase price of any property sold as unimproved or vacant. At the same time plaintiff signed an agreement which cancelled his former contract with the Cushmans and Aaron Brown.
At this point the plan was to have B.C.C. enter a new contract with Murchison for the purchase of the property, but Murchison objected to contracting with a corporation, so Merton J. Cushman contracted with him in his own name, with the understanding that the contract would be immediately assigned to B.C.C. At the time Merton J. Cushman entered into this contract with the owner, plaintiff pointed out that this would leave him with a contract with B.C.C., but the only substantial asset, the land contract, would be in Cushman's name. In view of this Cushman executed a memorandum to plaintiff stating that he would assign all his rights in the contract with Murchison to B.C.C., and plaintiff gave Cushman a general release. Although this contract never was assigned to B.C.C., the chancellor found as follows:
"A new contract to buy the property was entered into with Murchison in the name of the defendant Merton J. Cushman, but, in equity, the defendant B.C.C. Corp. must be regarded as the owner of the contract and entitled to all of its benefits."
Nothing was done to close the contract with Murchison, and in June, 1957, it was assigned by Merton J. Cushman to M.J.C., *705 Inc., which was to perform the contract, and in addition, pay to Merton J. Cushman $417,000. It appears that all of the stock subscriptions in M.J.C., Inc., were assigned to one John Shakespeare prior to issuance of stock, so that in effect the contract was sold to Shakespeare.
The contract with Murchison has been, or is being performed by M.J.C., Inc., and calls for total payment of some $774,000.
Under these facts the chancellor found that the transaction was in effect a sale of all the property vacant or unimproved by B.C.C., and hence decreed plaintiff to be entitled to 5% of the total purchase price of $1,191,606.60; however, as $297,000 of the purchase price was in deferred payments to Merton J. Cushman, plaintiff would be entitled to his 5% of this amount only as the installments were paid, as was provided in his agreement with B.C.C.
The defendants have raised a number of points on appeal, but they are aimed primarily at two basic contentions; one, that this case was not one properly cognizable by equity, and two, that the chancellor erred in his interpretation of the effect of the acquisition and disposition of the final contract with the property owner, the contract that ultimately found its way to John Shakespeare after increasing in value some $417,000.
In support of their first contention, lack of any basis for equitable relief, defendants strenuously urge that plaintiff should have been relegated to his remedy at law, if any, pointing out that he sought to invoke the aid of equity primarily to obtain an accounting, and where a complaint shows on its face that the amounts claimed are fixed and certain equity will decline the suit. 1 Fla.Jur., Accounts and Accounting, Section 14. Defendants further allege that plaintiff cannot prevail under the theory that he is entitled to an accounting as a joint adventurer, Donahue v. Davis, Fla. 1953, 68 So.2d 163, because all the elements necessary to create a joint venture, as expressly enumerated by our Supreme Court in Kislak v. Kreedian, Fla. 1957, 95 So.2d 510, are not present here. While it does appear that the element of control or right to control is lacking as far as the plaintiff is concerned, under the final arrangement between the parties, it must be remembered that the right to an accounting in equity between joint adventurers is only one manifestation of the larger principle that equity has jurisdiction to entertain an action for an accounting where a confidential or fiduciary relationship is shown to exist, 1 Fla.Jur., Accounts and Accounting, Section 17. See also 6 University of Florida Law Review 232, "Jurisdictional Prerequisites for an Equitable Accounting." In the present case the pleadings admit that the plaintiff was a joint adventurer with the personal defendants prior to the final arrangement under which plaintiff's participating share in the enterprise was reduced from a straight 25% to $100 a house and 5% of the selling price of unimproved property, and as such defendants owed him the strictest fiduciary duty. As stated in Donahue v. Davis, supra [68 So.2d 171]:
"As to the general duties and obligations of joint adventurers toward each other, they, like co-partners, owe to one another, so long as the relationship continues, the duty of the finest and highest loyalty. `Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. * * * Conduct subject to that reproach does not receive from equity a healing benediction.' Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1."
Defendants cannot now, in good conscience, contend that plaintiff's position is worsened because he relied upon them in releasing his claim under the original agreement in exchange for a claim against *706 the corporation created by the joint adventurers solely to effectuate the enterprise.
The parties stood in a fiduciary relationship to one another prior to entering the new agreement, and nothing about that agreement indicated this relationship was terminating; on the contrary plaintiff was persuaded to rely upon B.C.C., the corporate entity created and wholly owned by the other parties interested in the transaction, and he further relied on Merton J. Cushman to assign the contract to B.C.C., as he had promised in his written agreement. The equities are clearly with the plaintiff, and it requires no agile imagination to forecast the defenses which would be raised to any possible action at law plaintiff might bring: a suit against Merton J. Cushman for breach of contract would be met by the plea of no consideration and a general release; a suit against B.C.C. Corporation on the participating agreement would be met by a plea of no liability because the corporation never obtained the property as contemplated by the agreement; and further, as B.C.C. was erected solely to handle this deal, and the property would presumably have been its only asset, the satisfaction of a judgment against it alone would be limited to the solace of a moral victory, and that's hard to enjoy when the losers keep the marbles.
The case then would seem to fall clearly within the jurisdiction of equity, and if we entertain any doubt it would have to be resolved in favor of the chancellor's discretion. As it was so aptly put in Ponce v. Demos, 1947, 159 Fla. 117, 31 So.2d 58, 59:
"So, the rule that equity will not function when there is an adequate legal remedy, undoubtedly controls the clear cut unequivocal case, but in borderline cases like this, the chancellor has a broad discretion in choosing between forums. In doing so he is not to be so much concerned with refinements in pleading as he is with adopting the forum that will give aid to the party wronged. If the remedy at law is not as sensitive to the prompt administration of justice as the remedy at equity, then the latter should be adopted.
"In balancing the efficacy of remedies, the chancellor is concerned with that which points the speedy course to justice, he is not to indulge in refinements of procedure while the rem goes out of the picture or flees to another jurisdiction. Whether justice is administered a la mode or carte blanche is not so material, but it is material that it be administered promptly and effectively."
The appellants' second major contention is that the chancellor erred in holding that B.C.C. was the equitable owner of the contract between Murchison and Merton J. Cushman, and was entitled to all the benefits of this contract, as the evidence would not support such a finding. We have examined the record and find ample evidence to justify the chancellor in his disregarding the form adopted by the parties and spelling out the substance of the transaction. That equity regards as done that which ought to be done is a familiar and salutary maxim, eminently applicable to the present case. It is not denied that plaintiff was assured the contract would be assigned to B.C.C., yet if the lower court was bound by the legal form of things, under which B.C.C. never obtained the contract, plaintiff would be faced with the same obstacles to the recovery of his participating share as were previously discussed regarding plaintiff's legal remedies. In ruling that B.C.C. was the equitable owner of the contract the chancellor was merely applying this maxim, said to be as old as the equity courts themselves, Spear v. MacDonald, Fla. 1953, 67 So.2d 630, in a situation where it was warranted. Again, it is a familiar rule that equity will not allow a corporate veil to cover fraud or injustice. As stated in 7 Fla.Jur., Corporations, § 32:
"The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is *707 a legal theory introduced for purposes of convenience and to subserve the ends of justice. The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, will be disregarded by the courts. Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical, the corporate entity being disregarded where used as a cloak or cover for fraud or illegality."
Appellants also question the chancellor's construction of the agreement between plaintiff and B.C.C. in that he ruled the amount to be paid to Murchison by M.J.C., Inc., was part of the sales price to be included in computing plaintiff's five per cent. The pertinent portion of the agreement reads as follows:
"In regard to any of the above described property on which the second party shall not construct and sell houses but shall sell said property vacant or unimproved, i.e. with no structures located thereon, then in that event the first party shall receive from the second party the sum of 5% of the total purchase price of any or all such properties sold. * * *"
Under the agreement between M.J.C., Inc., and Merton J. Cushman (in equity B.C.C.) M.J.C. was to assume and perform the contract with Murchison as well as pay $417,000 to Cushman.
We have always been under the impression that "total purchase price" includes mortgages or other obligations assumed, in the absence of words to the contrary. This is certainly true in computing taxes or broker's commissions, 12 C.J.S. Brokers § 79 a, and appellants have not demonstrated why a different rule should govern here.
Affirmed.
KANNER, C.J., and ALLEN, J., concur.