676 F.2d 1069
 10 Fed. R. Evid. Serv. 1308
 PARLIAMENT INSURANCE COMPANY, an Illinois Corporation,
Plaintiff-Appellant,
v.
Adrian HANSON, an individual, and Mary Jo Hanson, his wife,
d/b/a C.M. & S. Construction, not incorporated,
Defendants-Appellees.
 No. 79-1804.
 United States Court of Appeals,
Fifth Circuit.
 Unit B*
May 28, 1982.
 
 Jeffry R. Jontz, Orlando, Fla., for plaintiff-appellant.
 Dennis M. Janssen, Thomas Riden, St. Petersburg, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before JONES, FAY and HENDERSON, Circuit Judges.
 JONES, Circuit Judge:
 
 
 1
 This diversity case arises out of an oral construction contract between the plaintiff-appellant Parliament Insurance Company and the defendant-counterclaimant-appellees Adrian and Mary Jo Hanson, doing business as C.M. & S. Construction.
 
 
 2
 The subject of this action is a 108 unit apartment complex located in St. Petersburg, Florida, known as the Dean Mohr Plaza Apartments. This project was planned in 1972 as a low-income housing complex. A mortgage on the apartment property was to be held by Atico Mortgage Co., and guaranteed under the Federal Housing Administration, hereafter called F.H.A., 236 program. The owner of the complex was to be the Dean Mohr Plaza Apartments, Inc. The original general contractor was Southeast Construction and Development Company and James Austin, a joint venture. Parliament, the plaintiff-appellant, issued performance and payment bonds running to the owner and insuring performance and payment by the general contractor.
 
 
 3
 The original construction contract was executed on December 20, 1972 in the amount of $1,332,000. In early 1973, the general contractor became financially distressed and announced that it was unable to complete the construction under its contract. At the time of the announced default, it was estimated that the project was fifteen to twenty-two percent complete. There were several unsuccessful attempts to restart the project in 1973.
 
 
 4
 Parliament first became directly involved in attempts to restart the project in 1974. Early in that year a representative of Parliament met with the owner and the F.H.A. Parliament decided to take responsibility for completing the project. It sought a general contractor to complete the work. Parliament's agent talked to various persons about undertaking the completion of the project. In that connection, Parliament's agent talked with the appellant, Adrian Hanson, who had been an underground site utility subcontractor on the original project. Hanson indicated that he was not interested, but that he knew of a general contractor in Cincinnati named Henry Gallenstein, who was familiar with similar projects and who might be interested in completing this one. Gallenstein was contacted and made one or more trips to the project. He estimated that it would cost $1,400,000 to complete the project and that there was not enough money left in the original construction contract to provide for completion. Gallenstein ceased to be interested in completing the project.
 
 
 5
 A meeting was arranged in Tampa between Hanson, Parliament's agent, and counsel for Parliament. There were discussions concerning Hanson's ability to complete the project, and the amount of money that would be necessary for that purpose. Ultimately, Parliament's counsel gave his approval to enter into an agreement with Hanson to complete the project. However, because Hanson had insufficient assets to fund the amounts necessary to complete the project and because materialmen and suppliers were reluctant to extend credit on the project, it was further agreed that Parliament would advance to Hanson the funds necessary to purchase materials, pay subcontractors, and hire laborers to perform the work. In some cases where suppliers would not accept Hanson's credit, Parliament would pay them directly at Hanson's direction. No formal written agreement was made concerning the oral understanding which had been developed. By March, 1974, Hanson had begun to reman the job and receive advances from Parliament. Hanson would make requests for funds either directly to Parliament in Chicago or to Parliament's office in St. Petersburg, which would relay the requests to the Chicago office.
 
 
 6
 Work continued on the project through 1974 and into 1975. Several times during this period, Parliament sent an accountant to St. Petersburg to review the books and records of Hanson with respect to his accounting for the funds which had been advanced. Although the accountant found that Hanson's books and records were poorly kept, neither he nor any representative of Parliament complained to Hanson about bookkeeping deficiencies. After the construction was substantially completed and certificates of occupancy were obtained, Hanson's employment was terminated by Parliament.
 
 
 7
 Parliament then commenced this action against Hanson. Parliament contended that Hanson had a fiduciary duty to account for the funds which had been advanced and on this basis, Parliament sought an accounting and damages. Hanson counterclaimed for breach of the oral contract. Hanson asserted that Parliament had breached an oral agreement to pay withholding and social security taxes for Hanson's workers, storage fees, equipment rental fees and a fixed sum of $132,500 as payment for the services of supervising and managing the construction project.
 
 
 8
 After a four day non-jury trial the district court dismissed Parliament's action and entered judgment on Hanson's counterclaim in the amount of $159,635. This judgment was later amended, and increased to $179,087. In this appeal, Parliament asserts that six errors were made by the district court. Parliament contends that the court erred in refusing to require a full accounting from Hanson for the funds advanced. It claims that Hanson was a fiduciary, who had an obligation to account. Parliament bases this argument on the fact that it disbursed $1,314,864 to Hanson, but that Hanson's records only show expenditures of $1,164,989 on the project. Parliament also contends that the complicated nature of these transactions, as well as the alleged agency status of Hanson requires a full accounting.
 
 
 9
 This diversity action is governed by the laws of Florida. Florida courts have stated the principle that in an action for accounting, there are two issues: whether there is the right to an accounting, and the amount due under the accounting. Manning v. Clark, 56 So.2d 521 (Fla.1951); Charles Sales Corp. v. Rovenger, 88 So.2d 551 (Fla.1956); Wood v. Brackett, 266 So.2d 398 (1 D.C.A.1972). Under Florida law, a party seeking an accounting has the burden of showing a relationship between the parties that requires or permits the ordering of an accounting. See, Riggs v. Saltmarsh, Cleaveland & Gund, 341 So.2d 818 (1 D.C.A.1977). Equity jurisdiction to obtain an accounting in Florida may rest upon the existence of a trust or fiduciary relationship, or the complicated nature of the transaction. F.A. Chastain Construction, Inc. v. Pratt, 146 So.2d 910 (3 D.C.A.1962); Cushman v. Schubert, 110 So.2d 703 (2 D.C.A.1959). See also Fla.Jur.2d, Accounts and Accounting, § 17-28. The district court held that the relationship between these two parties was merely that of oral contractors. No fiduciary relationship was created. Although an accounting may be proper where the accounts are complicated, F.A. Chastain Construction, Inc. v. Pratt, supra, the district court specifically held that Parliament had not shown any right to an accounting. To the contrary, the court found that Parliament had substantially defaulted on its major obligations under the oral contract, and was liable to Hanson for a breach of that contract. This Court has held, applying Florida law, that the right to an accounting is an issue of fact for the trier of fact. Smith v. AMI of Florida, Inc. 538 F.2d 1090 (5th Cir. 1976). The district court's findings are not clearly erroneous and are supported by the record. They will not be disturbed on appeal. F.R.Civ.P. 52.
 
 
 10
 Parliament's second assignment of error concerns evidentiary rulings of the district court with regard to the testimony of a former employee of Hanson, who later became an employee of Parliament's new contractor. This employee had access to some of the books and records of Hanson. He testified that he began to get suspicious regarding the money which Parliament was disbursing to Hanson. He claimed that Hanson was diverting some of the money for uses unrelated to the Dean Mohr project. When questioned about specific instances of monetary diversion by Hanson, the employee was unable to remember. However, he stated that he had made certain notes concerning these transactions which would aid his memory. The district court allowed voir dire on this subject. The witness then testified that he had regularly kept logs while he was employed by Hanson, contemporaneously with the asserted monetary diversions. The witness stated, however, that the notes he needed to aid his memory were not these original logs, but were abbreviated summaries taken from the logs. He also testified that these summaries were made after Hanson had been removed from the Dean Mohr project, when the witness became employed by Parliament's new contractor. Furthermore, the witness made these summaries within a short time of the commencement of this litigation. The district court refused to allow the witness to testify from these notes.
 
 
 11
 Parliament contends that these notes should have been made available to the witness under the theory of "present recollection refreshed". It claims that the former employee testified to a lack of memory, and that his memory could have been aided by reviewing these notes. In timely objections at the trial and on this appeal, Hanson contends that these notes were inadmissable, and were being introduced under the guise of "past recollection recorded".
 
 
 12
 It is to be noted that district courts have a wide range of discretion in matters concerning the admissibility of evidence. Roberson v. United States, 249 F.2d 737 (5th Cir. 1958); Weinstein's Evidence, § 612 (01) (1st ed., 1980). A leading case in this area is United States v. Riccardi, 174 F.2d 883 (3 Cir. 1949); cert. den. 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746 (1949). There it was stated:
 
 
 13
 The difference between present recollection revived and past recollection recorded has a demonstrable effect upon the method of proof. In the instance of past recollection recorded, the witness, by hypothesis, has no present recollection of the matter contained in the writing. Whether the record is directly admitted into evidence, or indirectly by the permissive parroting of the witness, it is nevertheless a substitute for his memory and is offered for the truth of its contents. It assumes a distinct significance as an independent probative force, and is therefore ordinarily required to meet certain standards. These requirements are the more understandable in consideration of the fact that the court is at once desirous of determining whether the writing may be safely received as a substitute for the witness' memory and for the truth of the matter therein asserted, and of affording the trier of fact information upon which it can form a reliable judgment as to its worth for the purpose offered.
 
 
 14
 In the case of present recollection revived, the witness, by hypothesis, relates his present recollection, and under oath and subject to cross-examination asserts that it is true; his capacities for memory and perception may be attacked and tested; ... (T)he trial judge must determine whether the device of refreshing recollection is merely a subterfuge to improperly suggest to the witness the testimony expected of him. 174 F.2d at 887-9.
 
 
 15
 In this case, the trial judge determined that the notes in question were made in anticipation of litigation, and were not made contemporaneously with the events at issue in this case. On the contrary, these notes were adopted from logs which had been written substantially earlier in time. There was no explanation as to the whereabouts of the contemporaneous logs which the employee had originally made, and from which these notes were later adopted. Furthermore, these notes were made while the employee was working for or preparing to work for a competitor of Hanson.
 
 
 16
 Taking these factors into account, the district court was acting within its discretion in excluding the notes, because of the lack of reliability surrounding them.
 
 
 17
 Parliament also asserts that the district court refused to let it proffer the employee's notes and testimony, and thus precluded both the district court and this court from fully viewing the evidence and ruling upon it. Proffers are governed by F.R. Evidence 103, which provides, in pertinent part:
 
 Rule 103, Rulings on Evidence
 
 18
 (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ...
 
 
 19
 (2) Offer of Proof.-In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which the questions were asked.
 
 
 20
 The purpose of this rule is to alert the court and opposing counsel to the thrust of the excluded evidence, enabling them to take appropriate action; and to provide an appellate court with a record allowing it to determine whether the exclusion was erroneous or not. See 10 Moore's Federal Practice § 103.22 (2d Ed., 1979); Dicks v. Cleaver, 433 F.2d 248, 252 (5th Cir., 1970). As our previous discussion concerning the trial courts' evidentiary ruling shows, Parliament's position was adequately stated, and the record is clearly susceptible to proper appellate review. Therefore, Parliament's contention that the trial judge erred in refusing to allow a proffer of the employee's testimony and notes is without merit. We need not cite the numerous sections of the trial record which indicate this.
 
 
 21
 Parliament contends that there is not substantial evidence in the record to support the district court's findings of fact and interpretation of the contract. A review of the record leads to the conclusion that the findings are amply supported. It is not the function of this Court to reweigh findings of fact. Williams v. National Surety Corp., 257 F.2d 771 (5th Cir. 1958); Williamson v. Brown, 646 F.2d 196 (5th Cir. 1981).
 
 
 22
 Parliament says that the district court erred in its calculation of damages. Parliament contends that the court credited rental costs of the equipment to Hanson, even though Hanson was periodically advanced funds to cover this equipment rental throughout the construction. Thus Parliament claims that Hanson is getting a double recovery for the rental value of his equipment.
 
 
 23
 The district court found that Parliament had agreed to pay Hanson an hourly rental for the use of his equipment on the construction site. Thus, the amount of damages which were calculated by the district court related to Hanson's use of his own equipment on the job. The funds which had been previously advanced to Hanson did not cover this portion of the contract. This finding of fact is not clearly erroneous, and is supported by evidence.
 
 
 24
 Parliament's fifth assignment of error arises from its cross-examination of one of Hanson's expert witnesses. Parliament claims that it was prevented from asking certain hypothetical questions of the witness on cross-examination, including questions based upon evidence then in the record.
 
 
 25
 There is no doubt but that wide latitude must be accorded during cross-examination. However, a review of the record shows that Parliament did, in fact, elicit the desired answers from the witness, who stated that if he "was to believe it (the hypothetical facts), it would reduce my estimate of the cost to complete by about one hundred and forty thousand dollars." This was the exact testimony which Parliament sought to elicit. It was not excluded by the trial judge. Only later did Parliament engage in a colloquy with the trial court concerning this type of hypothetical question. At that later time, the court expressed its disapproval. However, this later colloquy did not affect the earlier responses which had been given by the witness. It is apparent that Parliament's cross-examination of the witness was sufficient, and not unduly restricted.
 
 
 26
 Finally, Parliament contends that the trial court evidenced an "anti-insurance company" bias, which prevented them from receiving a fair trial. To substantiate this claim, Parliament refers to a few remarks made by the court during the course of this long, detailed trial.[1]
 
 
 27
 The relevant statutory provision governing disqualification of federal judges is 28 U.S.C. § 455. Paragraph (a) of Section 455 provides that a judge shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. This section imposes a reasonable man standard in determining whether a judge should recuse himself. Whitehurst v. Wright, 592 F.2d 834, 838 (5th Cir. 1979); U.S. v. Holland, 655 F.2d 44 (5th Cir. 1981). Additionally, paragraph (b)(1) of Section 455 provides that a judge should disqualify himself where he has a personal bias or prejudice against a party. The general rule is that bias sufficient to disqualify a judge must stem from an extrajudicial source. U.S. v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). In Davis v. Board of School Commissioners, 517 F.2d 1044 (5th Cir. 1975); cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), however, the court recognized that "there is an exception where such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party." Id. at 1051. In Whitehurst v. Wright, supra, at 837, it was stated that "the single fact that the judge's remarks were made in a judicial context does not prevent a finding of bias."
 
 
 28
 Applying this standard to the district judge's conduct, we conclude that no reasonable man would find bias or prejudice. A review of all of the remarks indicates no ill-will towards Parliament or its counsel in particular, or insurance companies in general. At worst, these remarks were off-hand statements by the court in a completely judicial context, during the course of a complicated bench trial. No bias or prejudice appears. Cf. United States v. Holland, supra. The judgment of the district court is
 
 
 29
 AFFIRMED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 Among the comments made by the trial court, which Parliament claims shows its bias is the following: The Court: "Yeah, I would like to see what the contract was. Now, listen, I have great faith in all the bonding insurance companies in this country. Don't you know that? That we couldn't live without them. But let me say this about insurance companies: They know what contracts are; they know what writings are; they know what agreements are, and they hold us to them..."