**Essie R. McDANIEL,**
**Plaintiff-Appellant,**

**v.**

**TEMPLE INDEPENDENT SCHOOL DISTRICT, Defendant-Appellee.**

**No. 84–1697.**

United States Court of Appeals,
Fifth Circuit.

Sept. 16, 1985.

Rehearing Denied Oct. 30, 1985.

Nelson D. Taylor, Baton Rouge, La., for plaintiff-appellant.

McGinnis, Lochridge & Kilgore, James R. Raup, William H. Bingham, John H. Spurgin, II, Austin, Tex., for defendant-appellee.

Before RUBIN and REAVLEY, Circuit Judges and FELDMAN *, District Judge.

FELDMAN, District Judge:

This is an appeal by the plaintiff from a judgment in favor of the defendant in an employment discrimination and retaliatory discharge case brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e—2000e-16. The district court also held for the defendant on plaintiff's claim that the defendant breached the terms of an EEOC conciliation agreement it had entered into with the plaintiff. The question presented is whether the district court's findings are clearly erroneous and, thus, should be set aside. We are also asked to consider (1) whether the defendant's proffered reasons for its adverse employment decisions concerning the plaintiff were established by admissible evidence; and (2) whether the plaintiff was denied a fair trial because of the trial court's failure to disclose to her the nature of an in-chambers conference he had with her attorney about the attorney's representation of the plaintiff. We affirm the district court's judgment.

## I. FACTUAL BACKGROUND

The plaintiff, Essie McDaniel, is a black female. The defendant is an independent school district organized in Texas. Plaintiff was first employed by defendant for the 1975–76 school year. She was subsequently re-employed for the 1976–77, 1977–78, 1978–79 and 1979–80 school years pursuant to one-year contracts. Plaintiff held various positions. She was Dean of Girls of the Temple High School from 1975–78. For the 1978–79 school year, she was employed as Dean of Students but reassigned to the position of Attendance Dean. She served as Attendance Dean of the high school for the remainder of her employment with the defendant.

She wanted to be an Assistant Principal. Ms. McDaniel first sought an Assistant Principal position in the school district in May 1977. She again applied for the same position in May 1978 when there were two vacancies at the high school. She was unsuccessful because all Assistant Principal positions were classified as administrative. Plaintiff was not certified as an administrator by the Texas Education Agency in 1977 and 1978.[1] The two vacancies in May 1978 were filled by an Anglo male and a Mexican-American male, who were both certified as administrators by the state.

In September 1978, the plaintiff filed her first discrimination charge against the defendant with the EEOC. She alleged that the school did not promote her to one of the Assistant Principal positions available in May 1978 and reassigned her to the Attendance Dean position for the 1978–79 school year on the basis of her race and sex. The first EEOC charge was settled in February 1979. The conciliation agreement obligated the defendant to take action with all due speed to determine the feasibility of upgrading the Attendance Dean position to an administrative position and to give plaintiff first consideration for future Assistant Principal vacancies and equal consideration for other administrative vacancies for which she was qualified. The school district's obligations were condi-

---

* District Judge of Eastern District of Louisiana, sitting by designation.

1. The dean positions that plaintiff held during her employment with the school district were not administrative and, thus, did not require an administrator's certificate.

tioned upon plaintiff's receiving temporary administrative certification.

In March 1979, plaintiff got her temporary certification as an administrator, and thereafter the Board of Trustees of the school district considered the feasibility of upgrading the Attendance Dean position. It decided not to upgrade the position. Plaintiff then filed a second EEOC charge in May 1979. The plaintiff charged that the school district breached the conciliation agreement because it failed to review the feasibility of upgrading the Attendance Dean position in a timely manner. Ms. McDaniel also claimed that the high school administration had criticized her job performance in retaliation for her having filed the first charge with the EEOC. The second EEOC complaint was determined against the plaintiff in August 1979.

But plaintiff persisted. In December 1979, she again applied for an Assistant Principal position that had become vacant at the high school. She was subsequently informed, however, that interviews for the position would not be conducted until the late spring and early summer of 1980. Moreover, by March 1980, after an informal and formal job evaluation, the plaintiff was notified by Mr. Jack Gunlock, the Principal of Temple High School, that he was recommending to the Board of Trustees that her employment contract not be renewed for the 1980–81 school year. The Board, in May 1980, accepted the Principal's recommendation and notified the plaintiff that her contract would not be renewed. Not surprisingly, plaintiff filed her third complaint with the EEOC.

In her third complaint, plaintiff alleged that her unfavorable evaluations and the school's decision not to renew her employment contract were intended to retaliate against her for her having filed the previous charges with the EEOC and were examples of race discrimination. She also claimed that the defendant breached the prior conciliation agreement because it did not promote her to the Assistant Principal position available in 1980. The record does not indicate how the EEOC disposed of plaintiff's third complaint, but a Notice of Right to Sue Letter was issued in October 1980.

In addition to filing the third charge with the EEOC, Ms. McDaniel requested a full evidentiary hearing before the school district's Board of Trustees concerning the nonrenewal of her employment contract. At the hearing, in June 1980, the plaintiff was represented by two attorneys, who presented evidence on her behalf and cross-examined witnesses for the school administration. The administration presented evidence of the plaintiff's unsatisfactory job performance. An observer from the Texas State Teachers Association was also present. Based on the evidence and testimony presented at the hearing, the Board of Trustees affirmed its decision not to renew Ms. McDaniel's employment contract.

## II. LEGAL FRAMEWORK AND STANDARD OF REVIEW

■ The law to be applied in Title VII discriminatory treatment cases is well established. *See United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The allocation of the evidentiary burdens is simple. First, the plaintiff has the burden of proving a *prima facie* case of discrimination.[2] The establishment of a *prima facie*

---

**2.** In general, to prove a *prima facie* case of disparate treatment, a plaintiff must show (1) that she belongs to a minority; (2) that she was qualified for the job for which the employer was seeking applicants; (3) that her application was rejected; and (4) that the employer continued to seek applicants from people with the same qualifications as the plaintiff. *Burdine,* 450 U.S. at 254 n. 6, 101 S.Ct. at 1094 n. 6.

In the instant case, the trial court did not expressly conclude that the plaintiff proved a prima facie case. We assume, however, that the trial court did reach such a conclusion since he proceeded to the second and third evidentiary

case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. Then, if the plaintiff succeeds in proving a *prima facie* case, the second evidentiary phase requires the employer to articulate some legitimate non-discriminatory reason for its adverse employment decision concerning the plaintiff. This is the employer's burden of production, not persuasion. The employer must clearly set forth, through the introduction of admissible evidence, the reason for the adverse employment decision. It, however, need not persuade the court that it was actually motivated by the proffered reason, although the explanation must be legally sufficient to justify a judgment for the employer. If the employer satisfies its burden of production, the presumption of discrimination disappears. The case then proceeds to the third evidentiary phase. (If the employer fails to satisfy this burden, the presumption of discrimination remains unrebutted and the plaintiff prevails.) The third evidentiary phase of the case requires the plaintiff to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason proffered by the employer was not the true reason for the adverse employment decision. The plaintiff may satisfy this burden by persuading the court that a discriminatory reason more likely than not motivated the employer or by showing that the employer's proffered reason is unworthy of credence. Furthermore, at this stage of the proceeding, the plaintiff must succeed in her ultimate burden of proving that she was the victim of intentional race or sex discrimination.

■ The law to be applied in a retaliatory discharge case is also well established. *See Jack v. Texaco Research Center*, 743 F.2d 1129 (5th Cir.1984); *McMillan v. Rust College, Inc.*, 710 F.2d 1112 (5th Cir.1983). Section 704(a) of Title VII expressly prohibits retaliatory conduct; it provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge" under Title VII. 42 U.S.C. § 2000e–3(a). To prove a violation of section 704(a), "the plaintiff must first establish a prima facie case of retaliation by showing (1) that she engaged in an activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in the protected activity and the adverse employment decision." *McMillan*, 710 F.2d at 1116. Similar to the evidentiary burdens in the discriminatory treatment context, if the plaintiff establishes a *prima facie* case of retaliation, the employer has the burden of producing some legitimate nondiscriminatory reason for the adverse employment decision and, if the employer satisfies this burden, the plaintiff must prove that the proffered reason is pretext for retaliation. *Id.*

■ In a retaliation case, however, the ultimate determination required for the plaintiff to succeed is different from a disparate treatment case. The ultimate determination is whether or not retaliation for filing a charge under Title VII was a "but for" cause of the adverse employment decision. As stated in *Jack*, "[w]hether or not there were other reasons for the employer's action, the employee will prevail only by proving that 'but for' the protected activity she would not have been subjected to the action of which she claims. If the employee does not bear that burden of persuasion, she may not prevail." 743 F.2d 1131 (citations omitted).

■ In the instant case, the trial court rendered judgment in favor of the defendant upon granting the defendant's motion for an involuntary dismissal made after the close of the plaintiff's case-in-chief. *See* Fed.R.Civ.P. 41(b).[3] Rule 52(a)

---

phases of the case. *See Nulf v. International Paper Co.*, 656 F.2d 553, 559 n. 3 (10th Cir.1981). Furthermore, as stated in *Aikens*, "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant." 460 U.S. at 715, 103 S.Ct. at 1482.

**3.** We disagree with the plaintiff's contention that Rule 41(b) involuntary dismissals are improper in Title VII cases because of the three-step evidentiary burden process employed in

instructs that the factual findings made by the trial court upon granting a Rule 41(b) involuntary dismissal are not to be set aside unless they are "clearly erroneous". Fed.R.Civ.P. 52(a). The "clearly erroneous" standard applies "whether the finding at issue is one of subsidiary fact or final fact that there was no [intentional discrimination or] retaliation." *McMillan*, 710 F.2d at 1116 (citations omitted). Furthermore, "[a] factual finding may be set aside under the clearly erroneous rule only if we are left, on review of the evidence, with the firm and definite conviction that a mistake had been committed." *Oil, Chemical and Atomic Workers International Union v. Ethyl Corporation*, 703 F.2d 933, 935 (5th Cir.1983) (citation omitted). That is, "[w]e may not reject the trial judge's findings simply because we might have arrived at a different result on the same evidence." *Id.* (citation omitted). We are also mindful that, in a disparate treatment case, the ultimate issue—whether the employer intentionally discriminated against the employee—is "peculiarly within the province of the factfinder." *Thornbrough v. Columbus and Greenville Railroad Company*, 760 F.2d 633, 641 (5th Cir.1985) ("Often, motivation and intent can only be proved through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder.").

## III. REVIEW OF THE DISTRICT COURT DECISION

■ First, we consider whether the evidence supports the district court's conclusion that plaintiff failed to prove that the school's proffered legitimate reasons for its decisions not to promote her to Assistant Principal in 1977 and 1978, and to reassign her to Attendance Dean in 1978 were pretextual. We hold that the court's conclusion was not clearly erroneous.

On cross-examination of the plaintiff, the defendant established that the plaintiff was not certified as an administrator by the Texas Education Agency when she first applied for an Assistant Principal position in May 1977 and then again in May 1978. The plaintiff, however, offered no evidence whatsoever that her failure to satisfy this requirement, which insures that an applicant will have the general qualifications for an administrative position, wasn't the true reason for not promoting her to one of the Assistant Principal vacancies.[4] Nor did Ms. McDaniel provide sufficient evidence that race or sex discrimination were more likely than not the motivating cause of the school district's decision not to promote her. When asked by her counsel why she believed she was not promoted because of her sex and race, plaintiff merely respond-

---

such cases. If the defendant, in a Title VII case, establishes its legitimate nondiscriminatory reason for the adverse employment decision during the plaintiff's case-in-chief, a Rule 41(b) motion is procedurally proper. *See Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1430 n. 4 (5th Cir.1984) *modified on other grounds on rehearing*, 753 F.2d 369 (5th Cir.1985); *Lewis v. Brown & Root, Inc.*, 711 F.2d 1287 (5th Cir.1983); *modified on other grounds on reconsideration*, 722 F.2d 209 (5th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984); *Ekanem v. Health and Hospital Corporation of Marion County*, 724 F.2d 563 (7th Cir.1983), *cert. denied*, — U.S. —, 105 S.Ct. 93, 83 L.Ed.2d 40 (1984); *Nulf v. International Paper Company*, 656 F.2d 553 (10th Cir.1981); *Sime v. Trustees of California State University and Colleges*, 526 F.2d 1112 (9th Cir.1975). The defendant can produce its legitimate reason during plaintiff's case either through adverse witnesses, express statements by the plaintiff, or documentary evidence. It then becomes the plaintiff's burden to prove that the proffered reason is pretext or that a discriminatory motive more likely than not led to the adverse decision before resting her case. If the court determines that the plaintiff had the opportunity to satisfy this burden before resting her case but that she failed to do so, it may grant the motion for an involuntary dismissal.

In the instant case, the defendant produced its legitimate reason with sufficient clarity during plaintiff's case-in-chief by plaintiff's own testimony and the documentary evidence admitted by both parties, and plaintiff had an opportunity to show pretext before resting. Accordingly, the trial court properly granted the Rule 41(b) motion.

4. Indeed, the two people who filled the vacancies in 1978 were certified administrators. *See* Tr. at 47.

ed that there were no women administrators at the high school although there were more girls than boys at the school and that there was only one black administrator at the school. We cannot, as plaintiff did, deduce from these facts alone that the school more likely than not discriminated against women and blacks and, thus, the plaintiff. Such a deduction would be based on mere speculation, not proof.

Ms. McDaniel also presented no evidence to establish that she was discriminated against when the school reassigned her to the Attendance Dean position in 1978. The evidence does not even establish that the reassignment was a demotion; it did not result in loss of pay or benefits. Moreover, the employment contract between the plaintiff and the school gave the school the right to reassign the plaintiff from Dean of Students to another position.

■ Next, we reach the question whether the district court erred in concluding that the school district's decision not to renew the Plaintiff's employment contract was neither a discriminatory or retaliatory action. The district court found that, during the 1979–80 school year, "[p]laintiff's employment relationship with [the school] was marked by disputes with supervisors, co-workers, parents, and students." It also found that the school's "administrative personnel repeatedly asked her to stay within her job description and to follow the administrative chain of command," which warnings she failed to follow. The district court also held (1) that the school district "based [its] employment decisions concerning plaintiff on a good-faith assessment of her abilities and performance," and (2) that "[p]laintiff's unsatisfactory performance and failure to follow administrative directives were valid, nondiscriminatory reasons for defendant's nonrenewal of her contract." In addition, according to the district court, plaintiff failed to prove that these reasons were pretext for unlawful discrimination.

Ms. McDaniel's job performance evaluations for the first three years of her employment with the school district were quite favorable. But in 1978 relationships began to deteriorate. Her evaluations for the 1978–79 and the 1979–80 school years were not good. Mr. Gunlock, the Principal of the high school, remarked, for example, that Ms. McDaniel was giving more consideration to her personal goals than to the school program, that her personal interests conflicted with the day to day operation of the school, and that she had difficulty following her job description. Ms. McDaniel's own testimony at trial substantiated that she was having difficulty getting along well with the school's administration and other personnel.

■ Ms. McDaniel offers two arguments in support of her contention that the district court erred in concluding that her unfavorable job evaluations were not motivated by a discriminatory or retaliatory intent. Both of these arguments are without merit. First, Ms. McDaniel claims that the school was mistaken in its negative evaluation of her performance and, in any event, the criticisms did not justify the nonrenewal of her contract. This argument is wide of the mark because the plaintiff has a far greater burden than merely to show that the defendant's decision not to renew her contract might have been wrong because she really was a good employee as shown by her first few job evaluations. As stated in *Burdine*, "[t]he fact that a court may think that the employer misjudged the qualifications of the [employee] does not itself expose him to Title VII liability." 450 U.S. at 259, 101 S.Ct. at 1097. Ms. McDaniel's second argument is that the defendant's proffered reason of poor job performance is a pretext for discrimination and retaliation because she never got written warnings of serious misconduct. Indeed, written warnings of serious misconduct are required by the school district's policy. The plaintiff, however, failed to offer any evidence showing that the school district equated plaintiff's poor job performance with serious misconduct and, thus, should have given written warnings in such situations. Serious misconduct could mean violation of school rules rather

than poor job performance. Indeed, the only example of serious misconduct given by the school policy itself is a violation of Board policies. Thus, plaintiff failed to prove pretext by the fact that she was never given written warnings of serious misconduct.

■ In concluding that the district court did not err in finding that the plaintiff's employment contract was not renewed for an impermissible reason, we must also conclude that the court committed no error in finding that the defendant's decision not to promote plaintiff to Assistant Principal in the summer of 1980 lacked a discriminatory or retaliatory intent.

■ Before we leave Ms. McDaniel's discrimination and retaliation claims, we address the plaintiff's contention that the defendant did not establish the legitimate reasons for its employment decisions through admissible evidence. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. We especially note that the only exhibit that plaintiff voiced any objection to at the time of trial was the transcript of the hearing held before the Board of Trustees on June 2, 1980 concerning plaintiff's appeal of the Board's prior contract renewal decision. This is defendant's exhibit A (documents offered during the hearing were attached to this exhibit).[5] The plaintiff contended that the exhibit contained hearsay and, thus, could not be admitted for the truth of the matters asserted. She did not, on the other hand, object to the limited admissibility of the exhibit to show the motive and intent of the Board of Trustees in deciding not to renew plaintiff's employment contract. Indeed, the exhibit was properly admitted for that limited purpose; thus, it was not hearsay. Fed.R.Evid. 801(c). It

was not admitted to prove the truth of the matters asserted for the simple reason that, in a Title VII case, the issue is not whether the employer made the correct decision in discharging the employee, but whether the employer intended to discriminate against the employee.

■ Next, we reach the question whether the district court erred in concluding that the defendant did not breach the conciliation agreement that settled plaintiff's first charge with the EEOC. As to this question, we also hold that the evidence supports the district court's conclusion. The plaintiff contends that the school district failed to fulfill its obligation "to take action with all due speed to review the Attendance Dean position to determine the feasibility of reclassifying and upgrading it to an administrative position, effective upon [plaintiff receiving] temporary administrative certification."[6] She claims that the school district did not immediately review the feasibility of upgrading the position when she received her temporary administrator's certificate in March 1979. This argument is without merit because the Board considered the matter at its very next meeting on April 16, 1979. She also argues that the agreement required the position to be automatically upgraded absent a legitimate reason not to do so. However, the plain meaning of the contract does not express such a requirement, and the plaintiff did not offer any evidence which altered its plain meaning. Furthermore, assuming that this requirement could be read into the agreement, plaintiff did not produce any evidence showing that the defendant had no legitimate reason for not upgrading the position.

---

**5.** Plaintiff's objection is also aimed at the admissibility of defendant's exhibits E and U, which she claims contain hearsay evidence. Defendant's exhibit E is plaintiff's job performance evaluation for 1980–81 and exhibit U is a memorandum dated May 12, 1980 from the Superintendent of the school district to the Board of Trustees that stated why the school administration was recommending that her contract not be renewed. Ms. McDaniel's counsel, at trial, expressly stated that she had no objection to the

admissibility of these exhibits. Plaintiff failed to make a timely objection in accordance with this rule and, thus, waived her right to object on appeal. Fed.R.Evid. 103(a). Furthermore, it should be noted that defendant's exhibit E is the same as plaintiff's exhibit 7e; thus, the exhibit was admitted by the plaintiff herself.

**6.** The conciliation agreement was admitted into evidence as defendant's exhibit T.

■ The plaintiff also contends that the school district breached its obligation to give her "first consideration" for future Assistant Principal vacancies because she was not promoted to the Assistant Principal position that became available in December 1979. The record establishes, however, that the school district's obligation to give plaintiff "first consideration" did not guarantee that the plaintiff would be promoted to the next vacancy. An EEOC representative explained that the words "first consideration" did not "constitute a Guarantee or red-circling of future vacancies." Most important, this agreement did not insulate the plaintiff from the effects of adverse employment decisions resulting from her poor job performance. The agreement does not excuse poor performance. Applicants for the position were not going to be interviewed until the late spring and early summer of 1980. By May 1980, however, the school district had already decided not to reemploy the plaintiff because of her poor job performance.

## IV.  A FAIR TRIAL

When this case first began in 1981, the plaintiff was represented by Dale E. Muller. In 1982, however, Muller was permitted to withdraw from the case because the plaintiff discharged Muller from employment. Subsequently, Ms. Susan Dasher represented plaintiff in opposition to defendant's motion for summary judgment. The motion for summary judgment was resolved in February 1984. Then, in March 1984, the district court notified all counsel of a July 1984 trial date. Ms. Dasher immediately filed a motion to withdraw from the case on the ground that she had only agreed to represent plaintiff on the motion for summary judgment and had not agreed to take the case to trial. Ms. Dasher also stated that she had not been paid by the plaintiff and did not have the resources to represent the plaintiff without a retainer. In June 1984, the district court ruled that Ms. Dasher could withdraw only upon the substitution of another attorney for the plaintiff. None occurred.

On the morning of trial, the court held an in-chambers conference with counsel for both parties. At the conference, Ms. Dasher urged her motion to withdraw from the case. She informed the district judge that the plaintiff and she were "at total odds with each other" as to the manner in which the plaintiff's case should be presented and she expressed to him her belief that Ms. McDaniel kept changing her testimony, that plaintiff's mental condition was deteriorating, and that plaintiff was acting very aggressively. Counsel was also unsure whether she or anyone else could adequately represent the plaintiff. The judge decided that he was going to allow the plaintiff to decide whether she wanted Ms. Dasher to continue to represent her or whether she wanted to proceed on her own behalf. The judge asked Ms. Dasher to continue as plaintiff's attorney if plaintiff so desired.

At the beginning of the trial, the judge explained to the plaintiff that Ms. Dasher was reurging her motion to withdraw, that plaintiff had the right to have counsel of her choice or to proceed on her own, and of the disadvantages of going it alone. The judge did not, however, disclose the details of the discussion about plaintiff. Ms. McDaniel told the judge that she wanted Ms. Dasher to continue to represent her and that she believed that Ms. Dasher could represent her competently and fairly.

On appeal, Ms. McDaniel contends that the trial judge denied her a fair trial because he forced Ms. Dasher to represent her and because he did not disclose the in-chambers discussion that he had with Ms. Dasher about plaintiff. Ms. McDaniel claims that Ms. Dasher was not an effective advocate because of her feelings about the plaintiff and because she was forced to remain as counsel in the case. Plaintiff also says that the judge was prejudiced by Ms. Dasher's negative remarks about her. Ms. McDaniel contends that she should have been given a chance to defend herself against those remarks. In addition, Ms. McDaniel seems to suggest that she would have chosen to proceed on her own had she been advised of the nature of the in-chambers discussion about her.

We agree with Ms. McDaniel that the trial judge should have disclosed to her the nature of the discussion he had with Ms. Dasher before asking Ms. McDaniel whether she wanted Ms. Dasher to represent her at trial. Disclosure to a party of the nature of an in-chambers conference with counsel is favored especially when the conference involves a matter directly concerning the party. Disclosure must be encouraged to insure that the party, rather than counsel, maintains ultimate control over his or her case and is given all pertinent facts on which to make informed decisions.

In the instant case, however, the trial judge's failure to disclose the in-chambers discussion with Ms. Dasher to plaintiff was harmless error. We have carefully examined Ms. Dasher's presentation of plaintiff's case at trial and the pleadings filed by her on behalf of the plaintiff. They demonstrate that Ms. Dasher was knowledgeable of the relevant law and the facts of the plaintiff's case. She was prepared for trial. Considering the many weaknesses in plaintiff's case, counsel was an effective advocate. There is also no reason for us to believe that the trial judge was prejudiced against the plaintiff by his in-chambers discussion with Ms. Dasher. Finally, we must underscore that plaintiff knew that Ms. Dasher wanted to withdraw from the case and plaintiff specifically decided she wanted Ms. Dasher for her lawyer.

For the foregoing reasons, the judgment is AFFIRMED.

AFFIRMED.

RUBIN, Circuit Judge, dissenting:

The majority reviews the record fairly and comprehensively. They and I agree that, as they say in part IV of the majority opinion, the trial court erred when it did not disclose what Ms. McDaniel's attorney said about her in chambers. The majority concludes that this was harmless error, finding "no reason to believe that the trial judge was prejudiced" or that Ms. McDaniel's choice of counsel would have been different. I respectfully dissent from this conclusion. Ms. McDaniel's rights were substantially affected because she was required to proceed unaware of her attorney's aspersions and because the judge did not disqualify himself.

Would any of us, judges or lawyers, experienced in the ways of the courtroom, consent to a trial before a jury who had heard our attorney say of us what Ms. McDaniel's attorney said of her: she had "perjured herself very severely during her deposition;" she "is changing her testimony minute by minute;" "her mental condition is deteriorating very rapidly;" "no one seems to have the same recollection of events as my client, including me;" and that Ms. McDaniel's E.E.O.C. attorney was present "to take the stand and impeach her if I call him?" Would any of us elect to be represented by a lawyer who had such an opinion of his client and her cause?

The questions are rhetorical because, to me, the answer to both is obvious. None of us would trust the jury to erase these words from memory and fairly assess our case. None of us would willingly proceed with a lawyer who is simply going through the motions of advocacy. The circumstances here are worse than my example in two respects: The judge who acted as the finder of fact presumably placed confidence in Ms. McDaniel's attorney because he had himself appointed her. Second, Ms. McDaniel was the sole witness. The entire case hung on the credibility of her testimony.

I do not imply that Ms. Dasher, Ms. McDaniel's lawyer, should have condoned what she believed to be perjury or that, having once failed in an effort to withdraw, she should not have impressed on the trial judge the reasons why she could not in good conscience continue as advocate.[1] She should not, however, have breached her duty of loyal representation to her

---

1. Cf. Whiteside v. Scurr, 744 F.2d 1323, 1326–29 (8th Cir.1984), cert. granted sub nom. Nix v. Whiteside, —— U.S. ——, 105 S.Ct. 2016, 85 L.Ed.2d 298 (1985).

client by an in-chambers communication to the judge [2] and the court should not have compounded her error by refusing to relieve Ms. Dasher of her court appointment. This was not a criminal case, and there was no speedy-trial imperative, nor was there any hint of contrivance by either client or lawyer to obtain a delay not otherwise available.

Bells cannot be unrung. Tolstoy could not stand in the corner and forget the white bear—even though it was imaginary.[3] Ms. McDaniel was stigmatized by private testimony unconstrained by the rules of evidence and untempered by cross examination.[4] If not ineradicable from the judge's mind, this created, at least, a situation in which the judge's impartiality might reasonably have been questioned.[5]

The standard for judicial disqualification is whether a reasonable person, knowing all the circumstances, and "under a realistic appraisal of psychological tendencies and human weakness"[6] would harbor doubt about the trial judge's impartiality.[7] Public respect for the legal system, as Congress and the courts have recognized, depends not only on doing justice, but also on demonstrating that the system operates fairly.[8]

[Our] stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." [9]

Even if I am incorrect in believing that Ms. McDaniel was prejudiced in having her case decided by a trier of fact who had received information outside the record, I do not agree that the harmless error rule should be applied. The issue is not whether she was in fact damaged but whether she or any other litigant would believe that, under the circumstances, a fair trial was possible. The appearance of prejudice is in itself a blight on the trial of a case that warrants a new trial, even if we were persuaded that the case would have come out no differently.

After hearing Ms. Dasher in chambers, the judge should have disqualified himself.

---

**2.** *Whiteside v. Scurr,* 750 F.2d 713, 714 (8th Cir.1984) (denial of rehearing en banc), *cert. granted sub nom. Nix v. Whiteside,* —— U.S. ——, 105 S.Ct. 2016, 85 L.Ed.2d 298 (1985).

**3.** When Leo Tolstoy was a child, his older brother taught him that he would be permitted up an imaginary mountain only on certain conditions:

These were: first, stand in the corner and not think about a white bear. I remember how I stood in the corner and tried and tried, but could not possibly keep from thinking of a white bear....

A. Tolstoy, A Life of My Father, 17–18 (1953).

**4.** *Cf. In re Murchison,* 349 U.S. 133, 138, 75 S.Ct. 623, 626, 99 L.Ed. 942, 947 (1955); *Price Brothers Co. v. Philadelphia Gear Corp.,* 629 F.2d 444 (6th Cir.1980), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981).

**5.** 28 U.S.C. 455 provides, in part:

Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

**6.** *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712, 724 (1975); *Dyas v. Lockhart,* 705 F.2d 993, 996–97 (8th Cir.), *cert.* denied, —— U.S. ——, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983).

**7.** *Chitamacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1165 (5th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *Parliament Insurance Co. v. Hanson,* 676 F.2d 1069, 1075 (5th Cir.1982); *Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1111 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 569 F.2d 251, 257 (5th Cir.1978), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978).

**8.** *SCA Services v. Morgan,* 557 F.2d 110, 113 (7th Cir.1977); Hearings on S. 1064 Before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 93d Cong., 1st Sess. (July, 1971–May, 1973) at 95; 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3541 (2d ed. 1984); Note, Disqualification of Judges & Justices in the Federal Courts, 86 Harv.L.Rev. 736 (1973).

**9.** *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955) (*quoting Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)).

If he did not do so, he should at least have given Mrs. McDaniel all the information that might reasonably have influenced her choice to proceed, either *pro se* or represented by the attorney who had damned both her and her case. Judicial case management, avoidance of delay, and denial of unjustified continuances are all commendable. They are, however, only means to an end. That end is justice; justice done and perceived to be done. However highly motivated the able trial judge may have been, it is not only Ms. McDaniel who suffers from what was done here. The splendor of justice is tarnished.