Marilyn **WILSON**

v.

**UNIVERSITY OF TEXAS HEALTH CENTER AT TYLER, et al.**

No. 1:91–CV–249.

United States District Court,
E.D. Texas,
Beaumont Division.

June 7, 1991.

Larry Robert Daves, San Antonio, Tex., for plaintiff.

Kathlyn Claire Wilson, Asst. Atty. Gen., Esther Lidia Hajdar, Lauri J. Schneidau, Atty. Gen.'s Office, Austin, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COBB, District Judge.

The plaintiff, Marilyn Wilson, filed suit against the defendants, alleging violations of 42 U.S.C. § 2000e *et seq.* (Title VII). Trial was had to the court. The court now enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff is a female citizen of the United States and is a resident of Smith County, Texas.

2. Defendant University of Texas Health Center at Tyler (UTHC) maintains a public health care facility in Smith County, Texas.

3. At all times relevant to this action, UTHC was a component of the University of Texas System.

4. Defendant UTHC is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, as amended. It is engaged in industry affecting commerce, and employs more than 15 persons.

5. Plaintiff was employed in the Police Department at UTHC from January 4, 1982, until March 5, 1987. Plaintiff began her employment as a cadet, and was promoted to police officer, then to Sergeant.

6. Plaintiff was demoted from the rank of Sergeant on February 5, 1987, and was discharged on March 5, 1987.

7. Plaintiff Wilson filed timely charges against UTHC with the Equal Employment Opportunities Commission (EEOC), alleging that she was discharged in retaliation for filing a sexual harassment complaint, and alleging discrimination based on sex, in hiring, pay, promotion, and termination policies and procedures.

8. Plaintiff Wilson instituted this action within 90 days of receipt of her notice of Right to Sue from the EEOC.

9. Plaintiff Wilson began her employment at UTHC on January 4, 1982, as a cadet. She soon thereafter attended the University of Texas Systems Police Academy and was promoted to Police Officer.

10. In August of 1983, Plaintiff Wilson was promoted to Sergeant. Soon thereafter she was made Acting Chief by her supervisor, Ron Mays.

11. Plaintiff Wilson chose not to apply for the permanent position as Chief of the UTHC Police Department.

12. In 1984, John Moore was hired as Chief of Police.

13. After Chief Moore was hired, plaintiff submitted various trivial complaints regarding the male guards who were her subordinates.

14. Plaintiff was counseled to use better judgment in reporting incidents involving her subordinates.

15. Plaintiff testified that during her employment at UTHC, she had encountered comments of sexual nature from some of the male guards. In particular, she complained that one male guard, Chester Davis, made jokes concerning "going to the woods."

16. Plaintiff testified that she considered the comments coming from her subordinates to be offensive. Although

she had the authority to do so, plaintiff did not order any of her subordinates to stop making the comments, nor did she complain to her supervisors concerning the comments.

17. Plaintiff's response to the comments was to laugh, or to respond in kind to the sexual comments; in fact, she joined in listening to risque jokes and told those jokes herself.

18. In the summer of 1986, plaintiff injured her shoulder while on duty. She was absent from work for several weeks.

19. In an attempt to save her sick leave, plaintiff requested Chief Moore that she be allowed to return to work prior to the time that her doctor certified her for a return to her full police duties.

20. Chief Moore allowed plaintiff to return to work early, filling in for the secretary for the Police Department. Plaintiff was to perform only secretarial duties, but her badge and her gun were not taken from her. During this time she received her full Sergeant's pay.

21. On September 19, 1986, after returning to her full duties, plaintiff made a verbal report to Chief Moore that she had been sexually harassed by one of the guards, Chester Davis, while she had been acting as a secretary.

22. According to plaintiff's report, on or about August 19, 1986, approximately one month prior to her report, Davis had driven with plaintiff to a remote location in order to look at a camera lens owned by plaintiff. Plaintiff had brought the camera to work to show it to Davis, who had inquired about the lens. It was plaintiff's suggestion that Davis drive her to the remote location. After looking at the lens, Davis allegedly attempted to kiss plaintiff on the neck. Plaintiff also reported that other women at the Health Center had complained to plaintiff regarding Davis' comments to them.

23. Chief Moore, along with Henry Jackson, the UTHC EEO officer, immediately began an investigation of the incident.

24. On September 25, 1986, plaintiff submitted her report of the incident (Defendant's Exhibit 3).

25. Along with her own complaint, plaintiff submitted reports of sexual harassment by Davis of three other female employees: Gerri Dingler, Jill Jones, and Donna Pilcher. Although plaintiff testified that these women came to her voluntarily, Donna Pilcher and Jill Jones testified that plaintiff actively solicited the complaints that plaintiff later reported. The evidence showed that Donna Pilcher did not feel harassed, but that plaintiff reported sexual harassment in spite of Pilcher's comments to plaintiff.

26. Chief Moore's investigation showed that Davis had made comments of a sexual nature to Jill Jones and to Gerri Dingler. Davis did not deny making those comments, but denied having attempted to kiss plaintiff. Henry Jackson's EEO investigation found from plaintiff's own report that any comments or actions by Chester Davis could not have been found to be unwelcome, since, by her own admission, plaintiff had laughed at Davis during the incident (Defendants' Exhibits 3 and 11).

27. Chief Moore determined Chester Davis had made unwelcome comments to Jill Jones and Gerri Dingler, and suspended Davis for three days without pay as a disciplinary measure.

28. In connection with her report, plaintiff was given a written reprimand for having failed in her duty as a police officer to report the incident immediately, and for having failed to take supervisory action against Davis.

29. On October 30, 1986, plaintiff submitted another report, alleging that Bill Glover, a male guard with the Police Department, had sexually harassed Nancy Sims, a female employee who worked in the outpatient clinic. Plaintiff's report was submitted after plaintiff interviewed Nancy Sims (Defendants' Exhibit 7).

30. Bill Glover was reprimanded as a direct result of plaintiff's report to the Chief.

31. After the reprimand of Bill Glover, Nancy Sims voluntarily came to Chief Moore and reported that no sexual harassment had taken place. Sims reported that numerous items in plaintiff's report of the incident were falsifications, and that plaintiff's report of the statements that Sims had given to plaintiff were factually inaccurate.

32. Two other women, Ruby Lollar and Pauline Green, who were reported by plaintiff to have witnessed the sexual harassment of Nancy Sims, also came to Chief Moore to inform him that plaintiff's report was inaccurate. Both women denied having complained to plaintiff regarding Bill Glover.

33. As a result of her false report which had resulted in a reprimand of one of her subordinates, plaintiff was suspended and demoted in rank to police officer.

34. On February 5, 1987, plaintiff was given a letter by Chief Moore explaining the reasons for the suspension and demotion. Chief Moore reviewed the letter with plaintiff, who made no comment, and who signed the letter, stating that she had read and understood the letter (Defendants' Exhibit 26).

35. Also on February 5, 1987, plaintiff was shown a Personnel Disciplinary Report outlining the reasons for her suspension and demotion. Plaintiff signed the report, but made no comments in the section provided for employee comments, although she was given the time and opportunity to do so. That report referenced attachments (Defendants' Exhibit 28).

36. Plaintiff requested a copy of the Personnel Disciplinary Report and the attachments. Chief Moore informed plaintiff that these documents were official police documents to be sent to the University of Texas Systems Police in Austin, and that he was not sure that copies could be provided. However, during this meeting, he allowed plaintiff to review the report and to write down the information on the report. Plaintiff was not allowed to see the attachments at this meeting.

37. After making her own handwritten notes, plaintiff obtained a blank Personnel Disciplinary Report form. She then typed the information from her notes onto the form and signed the blank form, making it appear much like the original. Plaintiff added, however, handwritten employee comments she had not made on the original form.

38. Plaintiff appealed her suspension and demotion. As a part of the appeals process, plaintiff and her attorney met with Ron Mays, Associate Director for General Services.

39. During the meeting regarding plaintiff's appeal, plaintiff's attorney presented the document that had been altered by plaintiff and requested the attachments.

40. Mays immediately took the document to Chief Moore in order to obtain the attachments. While in Chief Moore's office, Mays learned that the documents presented to him was not the original, but had been manufactured to resemble the original (Defendant's Exhibit 29).

41. Mays returned to the meeting with plaintiff and her attorney and asked who had created the document to resemble the original. Plaintiff answered that she had created the document. Plaintiff admitted at trial that she had not informed Mays at the time she first presented the document that the document was not a true copy of the original.

42. Plaintiff was terminated on March 5, 1987, for presenting a forged document during the official UTHC appeals hearing (Defendants' Exhibit 32).

43. Plaintiff was informed of the termination on March 5, 1987, by Chief Moore. She signed a letter of termination stating that she had read and understood the letter (Defendants' Exhibit 32).

44. Plaintiff appealed her termination, claiming that she was retaliated against for having filed the September 19, 1986, sexual harassment complaint against Chester Davis. She was given a hearing in front of the UTHC Equal Employment Advisory Committee (EEAC).

45. The EEAC is made up of five UTHC employees, and is established by the insti-

tution as an impartial tribunal to hear employee grievances.

46. Plaintiff was represented by counsel, was given notice of the charges against her, presented her own evidence, and had the right to cross examination (Testimony of Plaintiff).

47. At this hearing, Jill Jones, whose complaint against Chester Davis had been solicited by plaintiff, retracted her letter complaining that Davis had harassed her.

48. At trial, Jones testified that she had written the complaint because of statements made to her by plaintiff. Specifically, plaintiff had told Jones that other women had had problems with Davis, and had intimated that if Jones did not make a complaint, other women might be hurt.

49. The EEAC determined that plaintiff was not retaliated against for having filed a sexual harassment complaint, but that she was terminated for her misrepresentations regarding her fellow employees (Defendants' Exhibit 34).

50. Plaintiff originally claimed that she was retaliated against by Chester Davis, Chief Moore, Henry Jackson, Ron Mays, and Dr. George Hurst, the Director of UTHC.

51. Plaintiff testified that Chester Davis retaliated against her by leaving two notes to plaintiff. However, plaintiff admitted that both of these notes were given to her prior to her report of sexual harassment by Chester Davis.

52. Plaintiff also admitted under cross examination that Chief Moore, Henry Jackson, and Dr. Hurst had not retaliated against her (Testimony of Plaintiff).

## CONCLUSIONS OF LAW

1. This court has jurisdiction over Plaintiff's Title VII claims under 42 U.S.C. § 2000e–5(f)(3), and § 2000e–16(c).

2. In order to prove a violation of 704(a) of Title VII, which prohibits retaliatory conduct by an employer, an employee must establish a prima facie case of retaliation by showing that she or she engaged in protected activity, that an adverse employ-

ment action occurred, and that the activity was a "but for" cause of the adverse employment decision. *McDaniel v. Temple Independent School District*, 770 F.2d 1340, 1346 (5th Cir.1985).

3. Section 704(a) of Title VII provides: "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he had made a charge" under Title VII. 42 U.S.C. § 2000e–3(a).

4. Once a prima facie case of retaliation has been established, the burden of going forward with the evidence shifts to the defendant, who must articulate some legitimate nondiscriminatory reason for the discharge. *McDaniel*, 770 F.2d at 1346; *Jenkins v. Orkin Exterminating Co., Inc.*, 646 F.Supp. 1274, 1278 (E.D.Tex.1986).

5. Under the *McDaniel* test, plaintiff has failed to meet her burden to prove that "but for" her report of sexual harassment, she would not have been terminated.

6. First, although plaintiff was admonished for waiting one month to report the sexual harassment, no other adverse action was taken against plaintiff until she filed the false report alleging that Bill Glover had sexually harassed Nancy Sims. Given plaintiff's duties as a police officer, the reprimand for failing in her police duties was justified. Plaintiff admitted that she had been trained as a police officer and that she knew that she was to report incidents as soon as possible in order to aid a subsequent investigation.

7. Further, there is ample credible evidence to support UTHC's position that the suspension and termination of plaintiff was firmly based on legitimate, nondiscriminatory reasons.

8. Defendant UTHC suspended and demoted plaintiff on the legitimate nondiscriminatory basis of plaintiff's false claim of harassment of Nancy Sims by Bill Glover.

9. Plaintiff's information regarding the Bill Glover incident allegedly came from Ruby Lollar, Pauline Green and Nancy Sims.

10. Plaintiff admitted at trial that following plaintiff's report to the Chief, all three of these witnesses went to Chief Moore to inform him that plaintiff's report had been false.

11. Nancy Sims testified at trial that she had not reported to plaintiff that Bill Glover had harassed her, and that many of the factual allegations contained in plaintiff's report were untrue. Sims also testified that she reported these untruths to Chief Moore after hearing of the false report.

12. Chief Moore's decision to believe the three eyewitnesses rather than to believe plaintiff was reasonable and credible; thus, UTHC's suspension and demotion of plaintiff was made on a legitimate, nondiscriminatory basis.

13. While on suspension for her misrepresentations of the truth, plaintiff committed virtually the same offense by presenting a forged document during her appeal of the suspension and demotion.

14. Plaintiff admitted that she created the document and that she failed to identify it as merely her own facsimile of the original rather than being the original.

15. UTHC made the decision to terminate plaintiff for her continued misrepresentations. Given the facts surrounding the termination, defendant UTHC's reasons for the discharge are credible. Plaintiff was terminated for a legitimate, nondiscriminatory reason.

■ 16. If the employer articulates a legitimate reason for the action, the burden shifts back to the employee to show the articulated reason is pretextual. *McDaniel.* Plaintiff has failed to carry her burden of proof that UTHC's articulated reasons are pretextual. By plaintiff's own admissions and the testimony of Nancy Sims, Chief Moore, and Ron Mays, the credible evidence show that plaintiff was indeed discharged for her various misrepresentations and, at times, outright alterations of the truth.

17. Plaintiff also alleged in her EEOC charge that she was discriminated against in terms of her hiring, pay, promotion and termination.

■ 18. In order to prove a prima facie case of sex discrimination, a plaintiff must make a prima facie showing of discrimination by submitting evidence that (1) plaintiff was in a protected class; (2) that she was qualified for the position; (3) that she was discharged; and (4) that she was replaced by someone outside of the protected class. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

19. Once an employee makes a prima facie showing, the employer must articulate a legitimate, nondiscriminatory reason for the discharge. *Id.*

20. As in a retaliatory discharge case, an employee may still then prevail if he or she demonstrates pretext. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

■ 21. Even if a plaintiff demonstrates pretext, an employer may not be held liable if it can prove that the same decision would have been made even if gender had not been taken into account. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989).

22. Here, plaintiff has made no showing of gender discrimination in hiring, pay, promotion, or termination.

23. The evidence shows that plaintiff, a female, was hired into a predominately male police force, was promoted to Sergeant and to acting Chief, with attendant pay raises, and that she voluntarily chose not to apply for the job as Chief.

24. Even had she made out a prima facie case of discrimination, UTHC had ample legitimate and credible reasons for her suspension and termination. Plaintiff has failed to show that these reasons were in any way pretextual.

Accordingly, it is ORDERED that judgment on plaintiff's Title VII claims be entered in all respects for the defendant University of Texas Health Center.

Costs are assessed against the plaintiff. Judgment is to be submitted by the defendants.