Teresa M. DOWNEY, Plaintiff,

v.

William M. ISAAC, Defendant.

Civ. A. No. 83–3746.

United States District Court,
District of Columbia.

June 17, 1985.

Douglas B. Huron, Kator, Scott & Heller, Washington, D.C., for plaintiff.

Ann S. DuRoss, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

### INTRODUCTION

This case involves claims by Teresa M. Downey under Title VII of the Civil Rights Act of 1964, that because of her sex she was denied promotions, meaningful work assignments and was constructively discharged from her employment with the Federal Deposit Insurance Corporation ("FDIC" or "Corporation"). The plaintiff also claims retaliation for having filed sex discrimination charges against the FDIC.

The Court heard this matter in a bench trial and at the conclusion issued a bench ruling finding that the plaintiff failed to support her charges.

Pursuant to Rule 52, Fed.R.Civ.P., the Court enters the following findings of fact and conclusions of law.

## A.

### FINDINGS OF FACT

Ms. Downey, a 1974 female college graduate with a major in economics, was hired by the FDIC as a GG–4, step 4 clerk-typist in July 1974.[1]

Ms. Downey did not take the Federal Service Entrance Examination before coming to the FDIC. However, she had the understanding that within 90 days she would be promoted to a GG–5 Research Assistant. On October 27, 1974, she became a GG–5, Research Assistant. In December 1974, she successfully completed the Professional and Administrative Career Examination ("PACE") and as a result, in March 1975, she was promoted to Research Assistant, GG–7. In August 1975, she was promoted to Research Assistant, GG–8. On March 1, 1976, she was promoted to Research Assistant, GG–9.

In June 1976, Ms. Downey was awarded a Master of Science degree in accounting from Georgetown University. One year later she became a licensed Certified Public Accountant ("CPA") in Maryland in May 1977.

## B.

Prior to the adoption of the Merit Promotion Plan ("Plan"), effective in September 1978, the FDIC posting policy for position vacancies was fairly routine. Divisions/Offices would request a posting of positions. Postings were then prepared by the FDIC's personnel office and contained information as to how and where to apply; the closing date for receipt of applications; a description of duties (position description attached); a statement that required qualifications were contained in the United States Civil Service Commission Handbook X–118 and were available in the personnel

office of review; and information concerning grade level, occupational series, and position title.

Employees applied either by submitting SF–171's or memoranda. All applications/memoranda were forwarded to the interested Division/Office for consideration. The Division/Office made its selection and returned the personnel materials to the FDIC personnel office. That office then determined whether the selectee's qualifications met the requirements for the position.[2] The personnel office then notified the selecting official of its decision and proceeded with arrangements to effect any appropriate action.

Under the September 1978 Merit Promotion Plan, the FDIC adhered to the following posting policy: Divisions/Offices request posting of positions by the personnel office. The posting includes opening/closing dates; information relating to job title, series and grade; summary of duties and qualifications; selective and quality ranking factors; and where and how to file.

Applicants filed by submitting a SF–171 or memorandum if they had already established a Merit Promotion File. Applications/Merit Promotion Files were reviewed for completeness, i.e., SF–171 and performance evaluation. Qualifications determinations were made by the Staffing Specialists. FDIC applicants found ineligible were notified. If there were less than 5 qualified applicants for the position, all were referred to the selecting official for consideration. If 5 (or more) applicants were found qualified for the vacancy, a panel of three was assembled to rank the applicants.

The top 3 to 5 candidates were then referred by the panel to the selecting offi-

---

1. For all positions at issue in this proceeding, the FDIC adhered to standard federal personnel policy and practice. For example, FDIC relies on the X–118 criteria established by the United States Office of Personnel Management, which set qualification standards for particular positions. In addition, the pay schedules for FDIC and other federal agencies are identical for the positions at issue in this case, except that FDIC used GG rather than GS nomenclature.

2. In making qualification determinations FDIC personnel staffing specialists did not then, nor do they now, use position descriptions of positions encumbered by applicants. Nor were, or are, such position descriptions maintained in an employee's official personnel folder.

cial for consideration and selection. The candidates were referred in alphabetical order. The panel rankings were not forwarded to the selecting official. Less than 3 or more than 5 candidates would be referred if meaningful cutoff was otherwise precluded.

The selecting official made his determination and returned the roster to the personnel office. That office then took the necessary steps to initiate the action. Stipulation number 22; J.Ex. 39: 1978 Merit Promotion Plan; D.Ex. 21: FDIC Circular 2110.4; D.Ex. 22: Memo from OPM to All FDIC Employees re: Merit Promotion Plan.[3]

Minor changes were made to the Merit Promotion Plan in July 1980. Performance appraisals for merit promotion were adapted for general use. Annual performance appraisals were to be included by the employee establishing the file. Panels are now used only if more than 5 qualified applicants apply rather than 5 or more applicants. FDIC Merit Promotion Personal Data Sheet was offered as a substitute for the SF–171. Stipulation number 22; J.Ex. 41: 7/1/80 Directive to All Corporation Employees re Employee Performance Evaluation; D.Ex. 4: 1980 Merit Promotion Plan.

It was the responsibility of the employee as to what was placed in his or her Merit Promotion File. The Plan itself specified that it was also the employee's responsibility to ensure that information contained in an individual's SF–171 was current, since it was *the only* record of experience, awards, and training used to determine relative qualifications for posted positions. J.Ex. 39: 1978 Merit Promotion Plan. D.Ex. 4: 1980 Merit Promotion Plan; D.Ex. 21: FDIC Circular 2110.4; D.Ex. 22: 9/18/78 Memo re Merit Promotion Plan.

Although the FDIC provided its employees with the opportunity to compete for all available posted positions, and had a policy of hiring from within, the consistent corpo-

rate policy has been that the best qualified candidate would be selected, whether the candidate was an inside or outside applicant.

### C.

Two Senior Research Assistant, GG–11 positions, were filled in the Division of Research in 1977 under VA Nos. 77–68 and 77–173. The documentation for the filling of these positions was routinely destroyed in keeping with the Corporation's record retention schedules.

The credible testimony and evidence clearly showed that Patrick Karnes and Michael Russcol were chosen as the best qualified candidates for these positions by the selecting official, Dr. Gary Gilbert, Chief of the Economic Analysis Section in the Division of Research. To meet the particular needs of the section at the time, Dr. Gilbert was looking for a Senior Research Assistant with advanced computer programming skills. Mr. Karnes had utilized advanced computer programming techniques in his previous position and was also a former Bank Examiner who had first-hand knowledge of the actual inner workings of banks. Mr. Russcol also had extensive hands-on computer experience, as well as college-level courses in computer programming. Plaintiff did not have comparable experience and her advanced degree in accounting and her CPA were of little relevance to the position in question. J.Ex. 28: Karnes' SF–171; J.Ex. 40: Russcol's SF–171; J.Exs. 1 and 3: Plaintiff's SF–171s; D.Ex. 12: Investigative Files pp. 1–3.

In early 1978 William Birkes was selected as the best qualified candidate to fill a Financial Analyst, GG–9/11 position in the Division of Bank Supervision. Birkes was selected by Robert P. Rogers, Chief, Bank Support Unit, on the recommendation of Dr. Panos Konstas, Chief, Division of Management Systems and Economic Analy-

---

**3.** J.Ex. refers to jointly agreed upon exhibits. D.Ex. refers to defendant's exhibits; and P.Ex. refers to plaintiff's exhibits.

sis. The pertinent records here were also routinely destroyed. The evidence before the Court did not convincingly reflect that plaintiff was actually a candidate for this position. Dr. Konstas, who knew plaintiff personally since she was detailed to him from August 1977 to March 1978, reviewed all applications for the position in question and maintained that Ms. Downey was not a candidate for the job.

But even if plaintiff had been a candidate for the position, a fair and objective comparison of her credentials and those of the selectee—Birkes, showed that Birkes was clearly the more qualified candidate for the position as compared to Ms. Downey. Her accounting background was of marginal significance since accounting was only a small part of the requirements for the job. Mr. Birkes had been a state bank examiner, in fact, an examiner-in-charge, who had the supervisory experience and skills which the position called for. He had also worked for the American Bankers Association and had actually written instructions about bank reporting requirements.

On March 12, 1978, plaintiff was selected for one of two vacant GG–9/11/12 Financial Analyst positions in the Division of Bank Supervision, Registration and Disclosure Unit, by Lawrence H. Pierce. After Ms. Downey submitted a copy of her Master's Degree, she was qualified by personnel under the X–118 Qualification Standards as a GG–9. She did not submit any further qualifying information to personnel in order to attempt to secure Grade 11, despite Mr. Pierce's recommendation that she prepare a supplementary statement detailing her prior work experience as a Research Assistant.

In qualifying her as a Grade 9, the FDIC personnel staffing specialists did not treat her in any different manner than the other applicants for the position. The X–118 standards for the position of Financial Analyst require that to qualify for a Grade 11, an individual must have three years of specialized experience, two years of which may be substituted by advanced education, but one year of the specialized experience must have included financial analysis work at the Grade 9 level. Ms. Downey failed to detail any of her alleged prior financial analysis experience and therefore failed to qualify for a higher grade.

Dennis Chapman, the selectee for the second available position, qualified as a GG–11 because he had been working as a Financial Analyst in the 1160 series since 1974 and had been in Grade 9 for two years. While a Financial Analyst at the Securities and Exchange Commission, Mr. Chapman worked with filings under the Securities and Exchange Act of 1934, and did work similar to that required by the FDIC of its Financial Analysts. The Court finds that between him and the plaintiff, he clearly outstripped her in experience and training. The credible testimony and evidence supported his selection for the grade 11 position. J.Ex. 17: X–118 for Financial Analyst Positions; J.Ex. 3: Plaintiff's 1979 SF–171; D.Ex. 35: Karp Materials; J.Ex. 18: Position Description for Financial Analyst; D.Ex. 34: Posting Documents re 77–136, 77–205 and 78–19.

On March 25, 1979 plaintiff was promoted by Mr. Pierce to GG–11 Financial Analyst.

In early 1979, Ms. Downey applied for a GG–11/12 Economist position under VA No. 79–02. Initially she was found not qualified, but despite her late submission of qualifying information, the ranking panel was reconvened and considered her credentials. The panel did not rank plaintiff among those listed as best qualified and her name was not forwarded to the Selecting Official. Patrick Karnes was selected from the roster of eligibles at the GG–12 level. The FDIC personnel staffing specialists did not treat plaintiff in any different manner than other applicants for the position. J.Ex. 39: 1978 Merit Promotion Plan; J.Ex. 21: X–118's for Economist Positions; D.Ex. 6: OPM Posting File pertaining to VA No. 79–02; J.Ex. 20: Announcement 79–2, 1–8–79; J.Ex. 22: Position Description, Economist, 1–2–79; J.Ex. 23: Personnel Work Papers For 79–2; J.Ex. 28:

Karnes' SF–171; P.Ex. 27: Memo from Laurilla to Downey 3/6/79.

In early 1979, Ms. Downey also applied under VA No. 79–09 for a Financial Analyst GG–11/12, position. The ranking panel included her name on the best qualified list and forwarded her name on the roster of eligibles to Dennis Olson, the selecting official. John Quinn, whose name was also on the roster of best qualified candidates, was selected as the best qualified applicant. He was credited with one year of specialized experience based on his graduate work and credited with two years for his prior experience as a research assistant and then an economic assistant in the Division of Research. Mr. Quinn's SF–171 detailed his specialized experience. Plaintiff's SF–171, on the other hand, provided merely a brief, vague and general recitation of her research assistant duties.

Of all the candidates, he clearly had the most relevant experience. He had broad-based financial analysis work and specific hands-on experience with problem banks; he had also completed a study of purchase and assumption transactions with the aim of predicting P & A premium bids. Plaintiff's experience, on the other hand, was more accounting and budgetary work-oriented and she had little direct work analyzing or forecasting a bank's financial condition. D.Ex. 7: OPM Vacancy File pertaining to VA No. 79–09; J.Ex. 30: Quinn's SF–171; J.Ex. 31: Announcement 79–9, 1–31–79; J.Ex. 32: Personnel work papers for 79–9; J.Ex. 33: Position Description, Financial Analyst, 1–12–79.

### D.

The credibility and the value of the plaintiff's claims were weakened considerably through cross-examination of plaintiff herself and her expert, Mr. Robert Davis.

The plaintiff's testimony at the trial on a number of issues was contradicted by her own prior inconsistent testimony, by Corporation witnesses who were simply more believable than plaintiff herself and who were either corroborated by other witnesses or independent documentation. For ex-

ample, at her 1982 EEO hearing, Ms. Downey indicated that her computer experience was confined to a single project involving programming, while at the more recent trial, plaintiff supposedly recalled having actually written a number of computer programs, while at the FDIC; plaintiff's failure to recall three separate interviews for the 79–09 Financial Analyst position in Dennis Olson's section; plaintiff's alleged application and interview for the Financial Analyst position filled in April 1978 versus Dr. Panos Konstas and Darrell Nelson's recollection that she had not applied for the position nor had she been interviewed.

Plaintiff's expert testimony was of little relevance here since Mr. Davis relied upon information, i.e., an applicant's position description that, as a matter of FDIC policy and procedure, was not considered in making qualification determinations.

From July 24, 1979 to January 5, 1980, plaintiff was on approved leave without pay.

During her six year tenure with the FDIC, plaintiff received seven separate performance evaluations. J.Exs. 4–9, 61: Plaintiff's Performance Evaluations. In mid-1980, the FDIC was in the process of implementing a revised Merit Promotion Plan. As a part of the revised plan, new performance appraisals were developed and a single evaluation system was adopted. The due date for performance appraisals under the new system was the anniversary date of the employee's current appointment with the Corporation. A July 1, 1980 FDIC Directive disseminated to all Corporation employees clearly indicated that the personnel office was responsible for forwarding performance evaluation forms to appropriate rating officials. New evaluation forms under the plan were not, however, immediately available. Absent these forms, and under the direction of personnel, Mr. Pierce gave plaintiff a summary evaluation of "satisfactory" on the old form, enabling her to receive a within-grade increase to a Grade 11, Step 2, effective August 24, 1980. D.Ex. 4: 1980 Merit Promotion Plan; J.Ex. 41: 7/1/80 Directive

to All Corporation Employees re Employee Performance Evaluation; D.Ex. 12: Investigative Files p. 47.

Ms. Downey's career advancement at the FDIC was not dissimilar to other paraprofessionals or professionals in the Division of Research or the Registration and Disclosure Unit. D.Ex. 10: Administrative Discovery; J.Exs. 42, 44, 45, 46, 48, 49, 50, 51, 53: Job histories of plaintiff's peers and competitors.

Ms. Downey received a substantial amount of training while at the FDIC. Her Master's Degree was paid for by the FDIC and she was afforded leave during working hours to attend her classes. D.Ex. 13: Plaintiff's Training Record. Plainly, she was not discriminated against in this regard.

The plaintiff requested a "customary personnel evaluation" in July, August, October and again in December, 1980. Mr. Pierce construed these requests as asking for annual performance appraisals. In December 1980, it first became clear that plaintiff actually wanted a Merit Promotion evaluation. At a meeting on December 18, Mr. Pierce, and Mr. Moses told plaintiff that they would give her such an evaluation after the approaching holidays. Both Mr. Pierce and the plaintiff were scheduled to go on leave the next day until after the holidays. D.Ex. 12: Investigative File p. 56; J.Exs. 55, 56, 57: Plaintiff's Memos to Pierce re Performance Evaluations. Without returning to work, plaintiff resigned in January 1981. Stipulation number 21; J.Ex. 12: Plaintiff's Resignation Letter.

The Court finds from the preponderance of credible test and evidence that the plaintiff was not subject to retaliation or intolerable working conditions. She was subject to time and attendance constraints that were similarly applicable to all Corporation employees. She was not isolated from her peers. Room assignments were made by seniority and plaintiff's office was located in conformance with that policy. FDIC Leave Policy; D.Ex. 19: 29 C.F.R. § 1613.214(b); D.Ex. 12: Investigative File, pp.

50–53. J.Ex. 60: 3/3/80 Memo from Pierce to Downey.

## CONCLUSIONS OF LAW

In a discrimination case brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16 *et seq.,* plaintiff must first prove a *prima facie* case of discrimination by a preponderance of the evidence. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If plaintiff meets this burden, defendant is obliged to "articulate" some legitimate non-discriminatory reason for the complained-of actions. *Burdine, supra; Aikens, supra.* Should defendant succeed, plaintiff has the opportunity to prove by a preponderance of the evidence that the reason advanced by defendant was merely pretextual. *Burdine, supra; McDonnell Douglas, supra; Williams v. Boorstin,* 663 F.2d 109–117 (D.C.Cir.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981).

With respect to promotions, to establish a *prima facie* case of discrimination by disparate treatment, a "plaintiff must prove by a preponderance of the evidence that [she] applied for an available position for which [she] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine, supra,* at 253, 101 S.Ct. at 1093. An employer has the right to fix the qualifications that are necessary or preferred in selecting an employee for promotion. In order to make out a *prima facie* case, a plaintiff must establish that she meets these qualifications. *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 671 (4th Cir.1983), *rev'd on other grounds,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). Our Court of Appeals recently held that the issue in a case of an allegedly discriminatory failure to promote is not the objective superiority or inferiority of the

plaintiff's qualifications, but rather whether the defendant's selection criteria—be they wise or foolish—are nondiscriminatory. *Mitchell v. Baldridge,* slip op. 759 F.2d 80 (D.C.Cir.1985).

 In a Title VII action, a viable defense available to an employer includes the fact that the person selected for the position was better qualified than the plaintiff. A desire to hire the more experienced or better qualified applicant for a position is a recognized nondiscriminatory, legitimate, and common reason upon which to base a hiring decision. Title VII does not require that a less qualified female employee be given preference over a better qualified male. *Holder v. Old Ben Coal Co.,* 618 F.2d 1198, 1202 (7th Cir.1980).

 The Court concludes that while Ms. Downey made a threshold showing of sex discrimination, the testimony and evidence presented by the FDIC provides convincing and abundant support that sex discrimination was not a factor in the personnel decisions related to Ms. Downey's promotion efforts. In each promotion action challenged the FDIC demonstrated by persuasive testimony and evidence that the plaintiff was less qualified by training and experience.

 It is also a well settled legal principle that the standard of proof established for instances of employment discrimination is equally applicable in retaliation cases. *McCarthy v. Cortland County Community Action Program, Inc.,* 487 F.Supp. 333 (N.D.N.Y.1980). To prove a *prima facie* case of retaliation under section 704(a) of Title VII, the plaintiff must (1) show that there was statutorily protected participation; (2) that an adverse employment action occurred; and (3) that there was a causal link between the participation and the adverse treatment. *Whatley v. Metropolitan Atlanta Rapid Transit Authority,* 632 F.2d 1325, 1328 (5th Cir.1980). *See also Mitchell v. Baldridge, supra,* and *Rogers v. McCall,* 488 F.Supp. 689, 697–698 (D.C.D.C.1980). In a retaliation case, the plaintiff bears the burden of showing that

the defendant intended to retaliate when it took the actions complained of, and there can be no retaliatory intent unless there is knowledge that the plaintiff has, in fact, filed charges. *Downey v. A.H. Belo Corp.,* 402 F.Supp. 1368 (D.Tex.1975) and *Rogers v. McCall, supra* at 698. Thus, the plaintiff must establish that the employer had actual or imputed knowledge and that motivated by such knowledge, the employer acted with the intent to retaliate against or to punish the charging party. The plaintiff has not met this burden.

 To establish a *prima facie* case of constructive discharge, plaintiff must establish that the employer deliberately made working conditions intolerable and drove her into an involuntary resignation. *Clark v. Marsh,* 665 F.2d 1168, 1173 (D.C.Cir. 1981). *See also Young v. Southwestern Savings and Loan Association,* 509 F.2d 140, 144 (5th Cir.1975). In order to find constructive discharge, a court must determine whether or not a reasonable person in the employee's position and circumstances would have felt compelled to resign. *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th Cir.1980). Our Circuit Court has adopted the *Bourque* test and concluded that the mere fact of discrimination without some *aggravating factors* cannot sustain a finding of constructive discharge. *Clark v. Marsh, supra,* at 1173.

 Failure to promote, in and of itself, is not sufficient to result in a constructive discharge. *See EEOC v. Federal Reserve Bank of Richmond, supra* at 672, and *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir.1982). The law is clear that an employer has not effected a constructive discharge merely because an employee believes that she has limited opportunities for advancement, *Schaulis v. CTB/McGraw-Hill, Inc.,* 496 F.Supp. 666, 676 (N.D.Cal.1980). A claim of constructive discharge must be supported by more than an employee's subjective opinion that her position has become so intolerable and difficult that she must resign. *Neale v.*

*Dillon,* 534 F.Supp. 1381, 1391 (E.D.N.Y. 1982), *aff'd* 714 F.2d 116 (2d Cir.1982).

■ In sum, in a retaliatory constructive discharge case, a plaintiff must show that he/she was retaliated against because of his/her E.E.O. activity and that retaliation constituted intolerable working conditions in which a reasonable person in similar circumstances would have felt compelled to resign.

■ Ms. Downey has failed to prove that any of the nondiscriminatory reasons articulated by defendant were pretextual. She has not shown by a preponderance of the evidence that she was subjected to retaliatory, intolerable working conditions under which a reasonable person in similar circumstances would have felt compelled to resign.

The Court concludes that as a matter of law, judgment must be entered for defendant.