**David Leslie GIBSON, Angelo Rios and Ronald O. Hope, Plaintiffs,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., Robert Benson, Peter Flannery, Richard Dressel, and Jeffrey Sprung, Defendants.**

**No. 82 CV 5249 (RJD).**

United States District Court, S.D. New York.

May 3, 1988.

William J. Bennia, New York City, for plaintiffs.

Epstein, Becker, Borsody & Green, New York City, for defendants.

## MEMORANDUM ORDER

DARONCO, District Judge.

Plaintiffs Hope, Gibson and Rios commenced this action against their employer, American Broadcasting Companies, Inc. ("ABC"), including individual supervisory personnel, defendants Benson, Dressel, Flannery and Sprung, alleging discrimination under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Title VII), the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the New York Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* Plaintiffs individually assert that the defendants have discriminated against them, in different ways and at different times, in certain terms and conditions of their employment on the basis of their race or national origin. Plaintiff Hope, a newswriter with ABC Radio News since 1976, alleges that his assignment to editorial duties was unfairly delayed because he is black; plaintiff Gibson, an on-air correspondent for ABC Radio News since 1976, asserts that he was denied regularly scheduled weekends off because he is black; and plaintiff Rios, a desk assistant with ABC Radio News from 1976 to 1985, claims he was denied consideration and training as a newswriter because he is Hispanic. The defendants, pursuant to 42 U.S.C. § 2000e–5(k) and Rule 11 of the Federal Rules of Civil Procedure, seek attorneys' fees. The case is before the Court upon the defendants' Motion for summary judgment with respect to each plaintiff. Fed.R.Civ.P. 56.

Initially, in a Motion for summary judgment, the moving party must demonstrate the absence of any genuine issue of materi-

al fact. If the movant is successful, the burden shifts to the non-moving party to come forward with specific facts showing there is a genuine issue of material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). References drawn from the underlying facts must be viewed most favorably to the non-moving party. *Id.* However, if the non-moving party fails to raise a "sufficient disagreement to require submission to a jury," summary judgment may be properly granted to the movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Conclusory allegations of discriminations are insufficient to defeat a Motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

To make out a *prima facie* case of disparate treatment, a plaintiff must show that (1) he belongs to a protected group; (2) he was qualified for the position he sought; (3) he was denied the position; and, (4) the employer continued to seek persons of similar qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff succeeds in establishing a *prima facie* case and, thereby, raises an inference of discrimination, the burden of production shifts to the defendant employer to rebut the inference by articulating some legitimate, nondiscriminatory reason for its actions. If the defendant rebuts the inference of discrimination, the burden returns to the plaintiff to prove that the articulated reason proffered by the employer is a mere pretext to disguise unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Throughout a case of individual disparate treatment discrimination, the burden of persuasion remains with the plaintiff to prove the defendant intentionally discriminated against him. *Id.* at 254–55, 101 S.Ct. at 1094–95.

*Defendants.*

American Broadcasting Companies, Inc. American Broadcasting Companies, Inc. is composed of various divisions and departments. ABC News is a division of American Broadcasting Companies, Inc., and ABC Radio News is a program department of ABC News. ABC Radio News provides news broadcasts, on a contractual basis, to radio stations throughout the United States. ABC Radio is a division of American Broadcasting Companies, Inc., and encompasses the ABC Radio networks and the ABC owned stations. Until January 1982, ABC Radio had four radio networks: Contemporary, Entertainment, Information, and FM. In January 1982, ABC Radio added two networks, Rock and Direction, for a total of six networks, each of which caters to demographically distinct audiences. ABC Radio News also provides news broadcasts to ABC's different radio networks. Joint Facts, ¶¶ 1, 2.

Benson. From November 1978 until November 1983, defendant Benson, as vice-president, held the most senior position within ABC Radio News. In this position, he was responsible for the editorial content of newscasts, bulletins, special coverage and public affairs programming for the ABC Radio networks. From November 1983 to July 1986, Benson was Vice–President, senior executive, ABC Radio Networks, responsible for, *inter alia,* the affiliating of radio stations with ABC. From July 1986 to the present, Benson has been employed as Vice-President, ABC Radio News. Defs' Memo. of Law at 6; Plntfs' Memo. of Law at 8–11. Benson claims he never had any direct responsibility for, nor did he make any decisions affecting plaintiff Hope's assignment, plaintiff Gibson's schedule, or plaintiff Rios' requests to be a newswriter. Benson Aff. at ¶ 2.

Dressel. From 1968 until April 1982, Dressel was News Manager, Contemporary network. From April 1982 until his retirement in April 1986, he was Manager, Domestic Assignment, ABC Radio News. Dressel claims he never had responsibility for, nor did he make decisions concerning, plaintiff Hope's job assignments or plaintiff Rios' requests to be a newswriter. Defs' Memo. of Law at 8 citing Dressel Dep. at 4–13. Dressel hired plaintiff Gibson and was responsible for direct supervision of him and his schedule. Dressel Aff. at ¶ 4.

Flannery. Flannery was first employed by ABC Radio News in August 1968, as a newswriter, a position he held until June 1973, when he became News Manager, of the Entertainment radio network. In 1980, he became Assistant Director, ABC Radio News. From early 1982 until October 1983, he was General Manager, News Programming, ABC Radio News. In late 1983 until late 1986, when he resigned from ABC, he was Vice–President, ABC Radio News. From June 1976 until January 1983, Flannery was plaintiff Hope's direct supervisor, Flannery Aff. at ¶ 4. In 1978, he conducted an audition of plaintiff Rios's for a newswriter position, Flannery Aff. at ¶ 7; but he claims he never had any responsibility for, nor did he make any decisions affecting plaintiff Gibson's schedule. Flannery Aff. at ¶ 2.

Sprung. From September 1976 until April 1984, Sprung was employed as News Director, FM network. From April 1984 to the present, Sprung has been the News Director, Entertainment network. Plaintiff Rios worked under his direct supervision, Sprung Aff. at ¶ 7; on occasion, Sprung reviewed plaintiff Hope's job performance, *id.* at ¶ 4; but he claims he never had any responsibility for, nor did he make any decisions concerning plaintiff Gibson's schedule. *Id.* at ¶ 2.

*Plaintiff Hope.*

Plaintiff Ronald Hope, a black male, was hired as a newswriter by ABC Radio News ("ABC") in November 1976. Hope alleges he was a victim of racial discrimination in that Caucasian newswriters no better qualified than he received training and work as editors sooner than he did. Plaintiff Hope eventually received a permanent editorial position and, thus, his Complaint is that promotions were delayed due to alleged racial discrimination.

### Background

Newswriters are subject to a national collective bargaining agreement between the American Broadcasting Companies, Inc., the corporation defendant, and the Writer's Guild of America, East, Inc. ("WGA"). Newswriters may be assigned various positions in the newsroom, including "ops" person or tape editor in the operations studio, copy or rim editor, assignment editor, senior or charge editor, overnight editor, or "assigned to the desk." Newswriters assigned the tasks of senior editor, assignment editor, rim or copy editor are upgraded as "acting editors" and are entitled to a pay differential in accordance with the WGA contract. The pay differential is identical for all acting editor positions.

Ordinarily, newswriters initially work in the operations studio. The "ops" person performs a variety of functions, which include receiving incoming stories from correspondents, conducting telephone interviews, supervising engineers in the editing and transcribing of tape, and selecting materials for use in the various newscasts. "Ops" represents the first line of editorial responsibility in the newsroom, although no additional "acting editor" compensation is received. After sufficient development and experience working in "ops," newswriters may be assigned to the newsroom in an editorial capacity and receive a concomitant salary upgrade.

Plaintiff Hope was first employed by ABC Radio News in July 1974 as a desk assistant, the lowest level of non-clerical worker. In November 1974, Hope left ABC and became a news reporter for RKO General, where he remained until May 1975. Between May 1975 and June 1976, Hope worked part-time as a radio stringer reporter for radio station WTNJ.

In the spring of 1976, Hope applied for a vacation relief newswriter position at ABC Radio News. He was interviewed and auditioned for this position by, among others, defendant Flannery, and was hired in June 1976. A vacation relief newswriter position ordinarily ends when the regular employee returns to work. However, a permanent position as a newswriter may be extended to a vacation relief newswriter, if the individual demonstrates such ability that an offer of permanent employment appears warranted.

During his employment as a vacation relief newswriter, Hope was assigned to the

operations studio, except for two days on which he was trained as a rim editor. On September 16, 1976, Flannery wrote a memorandum in which he set forth an evaluation of eight vacation relief newswriters, including Hope, by some of ABC Radio network managers, editors and newscasters. Of the vacation relief newswriters eventually hired as permanent newswriters, plaintiff's performance was rated the lowest. Defs' Memo. of Law at 23. In December 1976, plaintiff Hope and three other vacation relief newswriters were offered permanent positions as newswriters. Prior to his acceptance as a regular newswriter, no one at ABC made any promises or representations to Hope concerning his future at ABC. Hope Dep. at 104. The four vacation relief newswriters not offered a permanent position were Caucasian.

Beginning in January 1979, plaintiff Hope was regularly "assigned to the desk" on weekends, an assignment he desired even though there was no WGA contract salary upgrade attached to it. Hope Dep. at 149. In late 1979, Hope began to substitute for absent assignment and rim editors. From June 1981 until December 1981, plaintiff Hope worked occasionally as assignment editor, in addition to working in "ops" and "assigned to the desk."

In December 1981, following two days of training, Hope began working as overnight senior editor several days a week; the remaining work days he was assigned to other editorial positions or "ops." In March 1982, Hope began working full time as an overnight senior editor, a position he held until February 1984 when he became an overnight assignment editor. In January 1986, Hope again was named an overnight senior editor, a position he still holds.

Defendant Flannery was Hope's supervisor from June 1976 when he was hired as a vacation relief newswriter until January 1983 when Merrilee Cox assumed the supervisory role. George Phillips was Hope's supervisor from August 1984 until his retirement from ABC in November 1986. From December 1986 to present, Peter Salinger has been plaintiff's supervisor.

Hope claims that after he was made a permanent newswriter, he requested, but was denied, opportunities to train and work as an acting editor. Hope Dep. at 132–33. Eventually, however, Hope received acting editor assignments, but alleges they were too late and too few relative to those received by allegedly "similarly situated" Caucasians. Hope alleges that during the period June 1976 to August 1981, he waited longer for and received fewer acting editor assignment and concomitant fees than Caucasian newswriters with comparable or lesser experience and performance. Specifically, he contends, and defendants do not dispute, he waited "1,050 days from his date of hire to receive his first acting editor assignment entitling him to a pay upgrade, (while) (n)o newswriter with a performance level less than or equal to Hope, who received an acting editor upgrade, waited more than 339 days from his or her date of hire to receive his or her first upgrade." Plntfs' Memo. of Law at 31. Hope also complains that from June 1976 to August 1981, he received only 7 acting editor assignments, while during the same period no Caucasian newswriter with a "performance level less than or equal to" Hope, who received an acting editor upgrade, received less than 41 assignments as acting editor. *Id.*

As early as November 1977, there were criticisms of Hope's performance by various ABC Radio managers. See Defs' Memo. of Law at 24, 25, 27. In October 1982, his supervisor, defendant Flannery, rated plaintiff's performance as average or below average. *Id.* at 27. Hope does not deny his performance was criticized by his peers and supervisors. In fact, as to some of them, Hope testified he considered them to be constructive criticism not based on any factor other than his performance. Hope Dep. at 97, 291.

As evidence that the Caucasian newswriters who received their first acting editor assignments sooner than Hope, or received more than Hope in the same period of time, were similarly situated, plaintiff recites discrete criticisms of seven individual Caucasian newswriters by various ABC manage-

ment personnel, including defendant Flannery. Plaintiff does not claim that these represent an overall performance evaluation by management, nor that management gives equal weight to each of the particularized criticisms. Additionally, when asked why he concluded that defendant Flannery intentionally denied him training and upgraded assignments because of his race, Hope responded that "when you examine the seniority listings and you see everyone beneath me in seniority who is either male or female Caucasian, given the opportunity to train and to work as an acting editor, ..., I think that speaks for itself." Hope Dep. at 345.

On August 12, 1981, Hope filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the State Department of Human Resources "(SDHR)", alleging that ABC discriminated against him with regard to his assignment, promotions, training and work schedule. Without making a determination on the merits, the EEOC issued Hope a right-to-sue letter on May 11, 1982. On August 9, 1982, Hope commenced the instant action along with plaintiffs Gibson and Rios, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the New York Human Rights Law, N.Y.Exec.Law §§ 290 *et seq.*, by ABC and individual supervisory personnel.

### Discussion

To make out a *prima facie* case of discrimination in promotions based on race, the plaintiff must demonstrate, *inter alia,* that while he was qualified, others, similary situated except for race, were given the position he sought but was denied. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff Hope seems to argue that he and the Caucasian newswriters complained of are similarly situated because they all had imperfect performances in that each of them received particularized criticisms from their superi-

ors. He further suggests a promotional right based on length of service, that more recent employees are not similarly situated to those with greater seniority. Hope Dep. at 136, 345. The defendants submitted testimony and Affidavits that plaintiff's race played no part in the selection of editors; rather, promotional decisions depend on the needs of ABC Radio News, a determination by ABC as to which employee would best fit that need, and the schedules of available personnel. Defs' Memo. of Law at 21; Flannery Aff'd. at 2; Cox Aff'd. at 2.

■ Performance Evaluations. Initially, plaintiff fails to establish, as he must, that he was qualified any sooner for the position he sought but was denied. *E.E.O.C. v. Federal Reserve Bank of Richmond,* 698 F.2d 633 (4th Cir.1983), *rev'd on other grounds,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (employer has right to establish qualifications that are necessary or preferred in selecting an employee for promotion, and to make out a *prima facie* case of discrimination, an employee passed over for a promotion must establish he met those qualifications); *Downey v. Isaac,* 622 F.Supp. 1125 (D.D.C.1985), *aff'd,* 794 F.2d 253 (D.C.Cir.1986). Hope recites very detailed criticisms by ABC supervisory personnel of the seven named Caucasian newswriters, Plntfs' Memo. of Law. 32–36, but utterly fails to establish any similarity among or equality of the criticisms. Plaintiff's compilation of critiques appears to be based on the erroneous assumption that race is the only distinguishing factor between plaintiff and the Caucasian newswriters advanced sooner than Hope. *See Martin v. Citibank,* 762 F.2d 212, 218 (2d Cir. 1985).

■ Plaintiff does not present evidence as to the way in which the criticisms are interpreted by ABC management, *i.e.,* whether they are afforded different or comparable weight in an overall performance evaluation of the various employees. *Payne v. FMC Corp.,* 609 F.Supp. 1132, 1134 (S.D.W.Va.1985) (black plaintiff failed to establish *prima facie* case of discrimination where no basis for meaningful compar-

ison of employees' respective qualifications nor any indication of their relevance was established). Plaintiff would have this Court either determine its own interpretation and weight of the relative merit of each of the recited criticisms, or accept plaintiff's own conclusion as to their merit and weight. Neither alternative is permissible. *Lieberman v. Gant,* 630 F.2d 60, 67–68 (2d Cir.1980); *Gibson v. American Broadcasting Cos., Inc.,* No. 82 CV 5249 (S.D.N.Y. June 9, 1987) (Stanton, J.) (Order) (at trial, the Court could be expected to exclude the subjective impressions of co-workers and follow the principles with respect to "comparative evidence" regarding other employees expressed in *Lieberman v. Gant* ).

■ Additionally, the correct inquiry is not whether the defendant employer made the correct decision, *McDaniel v. Temple Independent School District,* 770 F.2d 1340, 1347–48 (5th Cir.1985), but rather, whether there is any indication the reasons for the decision were discriminatory. *Burdine,* 450 U.S. at 258–60, 101 S.Ct. at 1096–97 (Court's belief defendant employer was wrong in assessing qualifications is insufficient in itself to impose Title VII liability); *See Davis,* 802 F.2d 638, 641 (2d Cir.1986); *Lieberman,* 630 F.2d at 65. Courts may rely on the evaluations of supervisors, *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985); *Hill v. Seaboard Const. Line RR Co.,* 642 F.Supp. 319, 322–23 (M.D.Fla.1986) (plaintiffs failed to show supervisor's decision making process used to assess their qualifications was any different than that used with non-minority candidates), as Title VII was not intended as a means of judicial review of business decisions. *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096–97.

■ Senority. Nowhere does ABC indicate senority is a factor in upgrading decisions, nor does plaintiff point to any evidence that he had a reasonable expectation that senority was an element in the editorial selection process. *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir.1984) (plaintiff makes out a *prima facie* case of employment discrimination in promotions if he establishes compa-

ny had some reason or duty to consider him for post). To the contrary, plaintiff Hope testified no promises were made to him regarding his future at ABC. Hope Dep. at 104. Therefore, plaintiff's claim of disparate treatment due to a failure of ABC to choose editors based on seniority is totally without merit.

■ Pretext. Assuming *arguendo* that plaintiff has succeeded in making out a *prima facie* case of disparate treatment, he fails to offer any evidence that the defendant employer's articulated reason for the challenged employment action is pretextual. In fact, plaintiff has not even addressed the issue of pretext. Accordingly, for the Court to deduce that the defendants' articulated nondiscriminatory reason for the challenged employment action—editorial positions are awarded based on a consideration of the needs of ABC Radio News at the time, a determination by ABC as to who would best fill that need, and the schedule of available personnel,—is mere pretext for impermissible discrimination would be "mere speculation, not proof." *McDaniel,* 770 F.2d at 1348.

A party opposing a properly supported Motion for summary judgment must come forward with specific, admissible evidence showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Plaintiff Hope "did not submit any proof or even allude to how (he) hoped to prove pretext at trial and, consequently, (his) mere conclusory allegations failed to overcome the defendant's showing." *Howard v. Holmes,* 656 F.Supp. 1144, 1149 (S.D.N. Y.1987). *See also Friedel v. City of Madison,* 832 F.2d 965 (7th Cir.1987) (summary judgment for defendant where plaintiff failed to dispute the employer's reasons for its actions, which were set forth in admissible evidence); *Mason v. Continental Illinois National Bank,* 704 F.2d 361 (7th Cir.1983) (where there is no evidence, direct or indirect, that racial animus played any part in denial of promotion plaintiff sought, and there was no reasonable possibility of plaintiff proving at trial that defendants' articulation was pretext and plaintiff's case

consisted entirely of conclusory allegations of discrimination, defendants were entitled to judgment).

For all the foregoing reasons, defendants' Motion for summary judgment as to plaintiff Hope is granted in all respects.

*Plaintiff Gibson.*

Plaintiff David Gibson, a black male, is an on-air correspondent with ABC Radio News assigned to ABC's Contemporary radio network. Plaintiff Gibson alleges he has been discriminated against because of his race, in that he has been denied scheduled weekends off while similarly situated Caucasians have had regularly scheduled weekends off. ABC contends race has not been a factor in the scheduling of plaintiff Gibson; rather, schedules are based on either the relative strength of the on-air correspondents' performances, or a negotiated contractual obligation. Dressel Dep. at 36, 47; Cox Dep. at 7, 16, 20–21; Dressel Aff. at ¶¶ 5, 6; Cox Aff. at ¶¶ 5–6.

*Background*

ABC Radio News on-air correspondents provide the voice for news broadcasts and write stories with materials provided by others. Joint Facts, ¶ 7. Generally, on-air correspondents work exclusively for one radio network, and Gibson has been assigned continuously to ABC's Contemporary network. The Contemporary network seeks to provide its listeners with news broadcasts seven days a week that are upbeat, written in simple declarative terms, and emphasize stories of interest to its young target audience.

Each weekday, the Contemporary network is divided into five shifts: morning drive, 6:52 a.m. to 10:52 a.m.; midday, 11:52 a.m. to 3:52 p.m.; afternoon drive, 4:52 p.m. to 8:52 p.m.; evening, 9:52 p.m. to 12:52 a.m.; and overnight, 1:52 a.m. to 5:52 a.m. Newscasts are broadcast beginning at eight minutes before the hour and are of one to three and one-half minutes duration. Joint Facts, ¶ 7. The weekday morning drive and afternoon drive shifts are considered the "prime time" of radio listening as the largest audience is reached. On weekends the audiences are smaller, Defs'

Memo. of Law at 13 citing Dressel Dep. at 37, and shifts are not denominated as "morning drive" or "afternoon drive." Plntfs' Memo. of Law at 17 citing Dressel Dep. at 93–95.

Performance of correspondents on the Contemporary network is measured by story delivery, writing ability and editorial judgment. Joint Facts, ¶ 12. Defendants allege that absent a contractual obligation, the relative strength of the performances of the on-air correspondents provides the basis for the schedules, with the stronger performers scheduled against the larger audiences.

Plaintiff Gibson was hired by defendant Dressel in November 1976 as an on-air correspondent on the Contemporary network with a Wednesday-through-Sunday evening schedule. At the commencement of his employment with ABC, although plaintiff requested at least one weekend day off (Plntfs' Memo. of Law at 18 citing Gibson Dep. at 46), he signed a three-year contract without negotiating a schedule. Defts. Memo. of Law at 13 citing Gibson Dep. at 28–36. In November 1979, Gibson signed another three-year contract of employment with ABC. While he had an opportunity to consult with counsel prior to signing his second contract which also required him to work weekends, Gibson did not do so, nor did he attempt to negotiate his schedule. Plntfs' Memo. of Law at 18; Defs' Memo. of Law at 13. Plaintiff alleges he was dissuaded from consulting with an attorney to negotiate his contract because ABC's in-house counsel told him no negotiations would be entertained. Plntfs' Memo. of Law at 18 citing Gibson Dep. at 69. In December 1982, Gibson signed another three-year employment contract with ABC, effective as of November 1982, which did not provide for a schedule. Joint Facts, ¶ 23.

Only one on-air correspondent, Snow, is identified as having negotiated a contract which provided for an agreed upon schedule. Plntfs' Memo. of Law at 19. (The period covered by Snow's contract is not identified). Her schedule provided that she worked the morning drive time, and that

she be given Saturdays and Sundays off. *Id.* Snow's contract was not renewed due to unsatisfactory performance. Cox Dep. at 30–31.

In August of 1980, Gibson sent a memorandum to Dressel in which he requested that he be assigned the Monday through Friday schedule, which would become available upon the departure of the correspondent currently scheduled for that time period. Joint Facts, ¶ 14. Subsequently, correspondent Mary Margaret Myers was assigned the schedule Gibson had requested. Defs' Memo. of Law at 14. Defendant Dressel claims the assignment was made based on his assessment of the performances of the Contemporary network correspondents. Dressel Dep. at 55–56. Gibson never contacted Dressel to discuss the matter any further, and testified he had no reason to believe Dressel was treating him unfairly. Gibson Dep. at 90, 92.

In November 1980, Gibson sent a memorandum to Dressel in which he complained about recent scheduling changes. He claimed the changes were unwelcomed by himself and other correspondents whom he later identified as Caucasian. Defs' Memo. of Law at 14 citing Gibson Dep. at 96. Gibson claims he also inquired why he was not scheduled for Monday through Friday days or early evenings. Plntfs' Memo. of Law at 20 citing Joint Facts, ¶ 15; Gibson Dep. Ex. 15. Two months after receiving the November 1980 memorandum, Dressel changed Gibson's schedule so that he was required to work later in the evening. Plntfs' Memo. of Law at 20; Defs' Memo. of Law at 15. Gibson did not register his dissatisfaction with Dressel concerning the schedule change. Defs' Memo. of Law at 15 citing Gibson Dep. at 112.

In August 1981, Gibson filed an individual charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("SDHR"), alleging that ABC discriminated against him on the basis of his race by failing to schedule him for Saturdays and Sundays off. In May 1982, without making a determination on the merits, the EEOC issued Gibson a right-to-sue letter. In August 1982, Gibson, along with plaintiffs Hope and Rios commenced the instant action.

From 1976, when Gibson was hired, until April 1982, Dressel was Gibson's immediate supervisor and determined his schedule. While Dressel considered Gibson to be competent, he viewed him as consistently the weakest of the correspondents on the Contemporary network. Dressel Dep. at 37. Accordingly, Dressel scheduled Gibson for shifts which required him to work Saturdays and Sundays when the audience is smallest; in addition, he was scheduled on weekdays for the remainder of his workweek. Dressel Dep. at 47.

In April 1982, Merrilee Cox replaced Dressel as News Director of the Contemporary network, and assumed responsibility for assigning Gibson's schedule. Correspondents are evaluated on an on-going basis in the areas of on-air delivery, writing, and editorial judgment. Cox Dep. 11–15. In each of the three areas in which on-air correspondents are evaluated, Cox perceived Gibson as being among the weakest. Cox Dep. 10–14. Cox scheduled on-air correspondents so that the strongest performers reached the largest audiences. Accordingly, Gibson was scheduled so that he did not have Saturday or Sunday off. Cox Dep. at 16, 20, 29.

Gibson asserts that during the entire period of his employment with ABC, he had never been scheduled for a Saturday or Sunday off, other than vacation or compensation days. Gibson further alleges that "(n)o Caucasian, full-time correspondent has ever worked on the Contemporary Network for eleven years without ever being scheduled for a single Saturday or Sunday off, except for vacation and compensatory days." Plntfs' Memo. of Law at 22 citing Gibson Aff. at ¶ 6. Additionally, from September 1, 1980 through December 31, 1982, Gibson contends that each of the Caucasian, full-time staff correspondents on the Contemporary network were scheduled to have Saturdays or Sundays off. Plnts' Memo. of Law at 22 citing Dressel Dep. at 137; Gibson Aff. at ¶¶ 6, 7. Plaintiff Gibson maintains he was as qualified to be

scheduled off on a Saturday or Sunday as the Caucasian correspondents so scheduled during the period September 1, 1980 to December 31, 1982. Gibson Aff. at ¶ 8.

In support of his contention that he was as qualified as the Caucasian correspondents who had a scheduled Saturday or Sunday off, Gibson points to the fact he remained an ABC correspondent for over 11 years and, therefore, presumably was at least minimally qualified, while the correspondents complained of were eventually terminated because their performances were not satisfactory. Plaintiff identifies seven correspondents who were his colleagues at various times throughout his employment with ABC. Plntfs' Memo. of Law at 22–23. Four of those named—Larson, Dewey, Coker and Miller—were no longer with the Contemporary network as of September 1, 1980, the first week during which plaintiff might have been scheduled off on a Saturday or Sunday in response to his August 27, 1980 memorandum requesting such a schedule. The remaining three —Smow, Berman and Myers—were terminated After September 1, 1980, because of unsatisfactory performance, but were scheduled for some Saturdays or Sundays off during the period September 1, 1980 and December 31, 1982. Also in support of his contention he was as qualified as the Caucasian correspondents who were scheduled or a Saturday or Sunday off, plaintiff submits discrete performance critiques by management of eight correspondents—Berman, Myers and Snow, who were terminated after September 1, 1980, and Barrett, Kerr, Ellis, Fox and Stoller, whose tenure are unspecified. Plntfs' Memo. of Law at 24–28.

The defendants assert plaintiff was consistently viewed by management as among the weakest correspondents, Dressel Dep. at 37; Cox Dep. at 10–14, and, in addition, Gibson's performance was criticized by his colleagues. Defs' Memo. of Law at 16–17. Gibson does not dispute this evidence, nor does he argue his performance warrants any higher evaluation.

The defendants point out that not only were Caucasians also given schedules which denied them a Saturday or Sunday off, Defs' Memo. of Law at 13 (citing Joint Facts ¶ 24–32), 18, but that a black freelance, part-time correspondent always had the weekend off, *Id.* at 18. Further, beginning in November 1984, the other correspondent required to work every Saturday and Sunday, except vacation and compensation days, is Barrett, a Caucasian correspondent.

### Discussion

■ Performance Evaluations. Initially, to make out a *prima facie* case of employment discrimination based on race, the plaintiff must demonstrate that he is qualified for the position he sought. *Burdine, supra; McDonnell Douglas Corp., supra.* Plaintiff Gibson appears to contend that he is qualified for a particular schedule because the correspondents who did receive the desired schedule, were either terminated or imperfect. Gibson does not challenge the basis upon which correspondents are evaluated, *Hill, supra,* merely the conclusion drawn as reflected in the schedule devised by management. *E.E.O.C. v. Federal Reserve Bank of Richmond, supra; Downey, supra.* Implicit in his argument is the erroneous assumption that race is the only distinguishing factor between himself and the Caucasian correspondents complained of. *Citibank, supra.* The plaintiff does not present any evidence as to the effect, if any, the particularized criticisms had on management's assessment of the correspondents. *Payne, supra.* Absent evidence of unlawful discrimination, the Court may rely on evaluations by superiors, *Meiri, supra,* and disregard "comparative evidence." *Lieberman, supra; Gibson, supra.*

■ Title VII was not intended as a vehicle for judicial review of business decisions, *Burdine, supra* at 258–60, 101 S.Ct. at 1096–97, and, therefore, the inquiry for the Court is not whether the defendant employer made the correct decision. *McDaniel, supra.* Accordingly, absent any evidence of discrimination, the fact that ABC may have incorrectly evaluated correspondents and subsequently rectified

the error by either rescheduling or terminating the correspondents is insufficient to impose Title VII liability. *See Burdine, supra; Davis, supra; Lieberman,* 630 F.2d at 67 (no inference of discrimination can be drawn where decision is reasonably attributable to honesty even though partially subjective evaluations of respective employees).

■ Seniority. While the point is not entirely clear, it appears plaintiff asserts he is qualified for a weekend-off schedule because of his 11 year seniority—"No Caucasian, full-time correspondent has ever worked on the Contemporary Network for eleven years without ever being scheduled for a single Saturday or Sunday off...." Plntfs' Memo. of Law at 22. ABC claims performance assessments, not seniority, is the basis for scheduling, and plaintiff Gibson does not offer any evidence that he had a reasonable expectation that seniority was an element in the determination of schedules. *Carmichael, supra.* Consequently, this argument is totally without foundation.

■ Contract. Plaintiff Gibson never negotiated nor executed a contract which obligated ABC to give him an agreed to schedule. Thus, he cannot demonstrate he was qualified for a weekend-off schedule because of a contractual expectation. The fact that correspondent Snow negotiated a contract which provided for weekends off and, subsequently due to unsatisfactory performance, her contract was not renewed, is insufficient to raise an inference of discrimination. *Carmichael, supra.*

For the foregoing reasons, the Court finds the plaintiff has failed to make out a *prima facie* case of employment discrimination because he is unable to demonstrate he was qualified for the schedule he sought. *See Davis, supra; Colucci v. New York Times Co.,* 533 F.Supp. 1005 (S.D.N.Y.1982) (plaintiff failed to establish a *prima facie* case of discrimination in promotion where he failed to show he was qualified for the position); *compare Low-*

*ery v. WMC–TV,* 658 F.Supp. 1240 (W.D. Tenn.1987), *vacated,* 661 F.Supp. 65 (W.D. Tenn.1987) (Court's decision vacated by settlement agreement of the parties) (evidence was sufficient to establish *prima facie* case of racial discrimination in television station's denial of a weekday or weeknight schedule for a black weekend news anchor, where consulting firm and focus group of viewers rated black anchor favorably, where black anchor had the necessary qualifications and experience but position was given to less qualified white candidates, and the station general manager testified that a higher standard was imposed on black anchor than on white anchor).

■ Pretext. Even assuming *arguendo* that plaintiff succeeded in making out a *prima facie* case of disparate treatment, he cannot survive defendants' Motion for summary judgment. Plaintiff does not offer a scintilla of evidence that the defendants' articulated reason for the challenged employment action is pretextual. For the Court to deduce that the defendants' articulated nondiscriminatory reason is a pretext for impermissible discrimination, would be "mere speculation, not proof." *McDaniel, supra.*

Plaintiff Gibson has failed to come forward with specific, admissible evidence showing there is a genuine issue for trial, *Anderson, supra.* His conclusory allegations of employment discrimination are insufficient to meet the defendants' showing. *Howard, supra; see also Friedel, supra; Mason, supra.* For all the foregoing reasons, defendants' Motion for summary judgment as to plaintiff Gibson is granted in all respects.

*Plaintiff Rios.*

Plaintiff Angelo Rios, an Hispanic male, was employed by ABC Radio News as a desk assistant from early 1976 until March 1985, when he was terminated for insubordinate conduct.[1] Rios alleges he was discriminated against because of his Hispanic origin, in that he was denied a change in

---

1. The issue of plaintiff Rios' suspension by ABC is not before this Court. Plntfs' Memo. of Law at 52.

position from desk assistant to newswriter. ABC asserts that neither race nor national origin were factors in their decision not to hire Rios as a newswriter. Rather, he was not considered for a newswriter position because he did not have the requisite background of several years of major market broadcast journalism.

*Background*

From 1974 until early 1976, prior to his employment with ABC Radio News, Rios worked for Maravilla Productions, a television news production company, as a researcher and field producer. In early 1976, productions ceased because of budget cutbacks, and Rios applied for a position with ABC Radio News as a desk assistant. He was offered and accepted a temporary, two-week position as a desk assistant. Shortly thereafter, he was offered and accepted a position as a vacation relief desk assistant. Eventually, Rios became a permanent newswriter. The duties of desk assistant include stripping teletype wires, going to outside newsstands to buy newspapers for the office, delivering packages, tapes, memoranda, and performing other errands as requested.

The position of desk assistant is subject to a collective bargaining agreement between ABC and the Writers' Guild of America ("WGA"). Pursuant to that agreement, a desk assistant with more than nine months of service may, at the employee's request, be given up to three days per calendar quarter of "observation days," which are designed to improve the desk assistant's potential as a newswriter. The observation days alone, however, are insufficient to qualify a desk assistant as a newswriter, a position not considered a promotion since it is not in the career path of a desk assistant. Rios Dep. at 47, 48, 54. Apart from the observation days, desk assistants generally receive no training in newswriting. Rios Dep. at 179. On several occasions, pursuant to the WGA contract provision, plaintiff Rios asked for and received observation days. Rios acknowledges his requests for observation days were never denied, and he is unaware of any training any desk assistant ever re-

ceived that he did not receive. Rios Dep. at 54, 179. Further, while ABC acknowledges it has hired former desk assistants as newswriters, *e.g.* plaintiff Hope, Rios admits he knows of no one who has ever moved directly from desk assistant to newswriter. Defs' Memo. of Law at 29 citing Joint Facts ¶ 86.

In November 1977, plaintiff Rios asked to be considered for a position as a newswriter and offered to resign from his position as a desk assistant. The request was directed to defendant Flannery, who was not his supervisor, but as the manager of news for the Entertainment Radio Network, had the authority to hire, fire and promote newswriters. Flannery rejected Rios' offer of resignation and, by memorandum, responded that Rios did not have the "required experience, *i.e.*, several years of major market newswriting experience. *Id.* (Joint Facts ¶ 87)," Defs' Memo. of Law at 32, and that "he did not come up to certain standards (Rios Dep.Ex. 7)," Plntfs' Memo. of Law at 38. Rios states he is unaware of any other desk assistant who was given the opportunity to audition as a newswriter. Defs' Memo. of Law at 33 citing Rios Dep. at 90. Rios subsequently sent a memorandum to Flannery, entitled "VR Employment," in which he stated, *inter alia,*

> "There will be no cry of racial or ethnic discrimination on your part, by this writer. In my estimation, you are a good man. Be sure if the subject ever comes up (via personnel or other organizations) I would rise up in your defense.... There is no doubt I lack the radio experience which you look for in a writer."

Defs' Memo. of Law at 33 citing Joint Ex. 76, 79.

In late 1977 or early 1978, Rios brought to the attention of ABC's Personnel Department his desire to become a newswriter. Consequently, Flannery conducted an audition of Rios for a newswriter position. The audition was evaluated by Flannery and Rios' supervisor, defendant Jeffrey Sprung, supervisor of the desk assistant staff. Joint Facts ¶ 88. Flannery and Sprung concluded Rios lacked the neces-

sary radio experience and as not qualified for the position of newswriter. Defs' Memo. of Law at 33 citing Joint Facts ¶ 88; Joint Ex. 83, 84. The parties disagree as to whether Sprung, Rios' immediate superior, attended the audition, whether both Flannery and Sprung conveyed the results of the audition to Rios, and whether Flannery agreed Rios would be given a second audition. Plntfs' Memo. of Law at 39; Defs' Memo. of Law at 33.

Between February 1978 and March 1981, plaintiff Rios, both verbally and in writing, continued to request of Flannery that he be considered for a newswriter position. The requests were denied, and Flannery indicated Rios "did not possess five years major market experience to qualify for consideration. (Rios Dep. at 170; Rios Aff., Para. 6)." Plntfs' Memo. of Law at 40. Rios alleges, however, that while he was told he needed five years of major market broadcast journalism experience, during the period 1977 to 1982, ABC Radio News "hired Caucasian newswriters who did not possess the experience Rios was told he needed ... (and) ABC Radio News has provided Caucasian candidates who performed poorly during their auditions or at a level indicating the need for further development due to lack of radio experience or other causes, with the training, teaching and direction necessary to become newswriters, or have hired them in spite of their poor performances, or need for further development." (Citations omitted).

Plntfs' Memo. of Law at 40.

In support of his claim of discrimination, Rios identifies nine Caucasians who auditioned and were hired as newswriters during the relevant time period. None had five years major market broadcast journalism experience, and some had none. None were desk assistants, although two were former desk assistants. One was given a second audition two weeks after the first unsatisfactory audition. Further, Rios sets forth the discrete criticisms by management of their audition performances, and management's express reservations concerning the qualifications of some of the interviewees for a newswriter position. Plntfs' Memo. of Law at 40–45.

On August 5, 1981, Rios filed an individual charge of employment discrimination against ABC with the Equal Employment Opportunity Commission ("EEOC") and the State Department of Human Rights ("SDHR"), alleging that ABC failed to hire or train him for a newswriter position because of his national origin. 42 U.S.C. §§ 2000e *et seq.;* 42 U.S.C. § 1981; N.Y. Exec.Law §§ 290 *et seq.* At Rios' request, the EEOC issued a right-to-sue letter on May 11, 1982, without making a determination on the merits. Subsequently, on August 9, 1982, Rios commenced the instant action along with plaintiffs Gibson and Hope. Beginning in early 1982, Rios engaged in several acts of insubordination which eventually led to his discharge from ABC in March 1985. The discharge was grieved and upheld by an impartial umpire.

### Discussion

██ Defendants' Motion for summary judgment as to plaintiff Rios is denied. ABC states that a prerequisite for consideration as a newswriter is several years of major market broadcast journalism experience, Defs' Memo. of Law at 29; Cox Dep. at 5–6, and assert that Rios' lack of such experience was the reason for his not being hired as a newswriter. Joint Facts ¶ 87; Defs' Memo. of Law at 32; Plntfs' Memo. of Law at 38. Defendants do not deny that Caucasians without the requisite experience have been hired, nor do they offer any relevant evidentiary explanation as to why the prerequisite was waived for them but not for plaintiff Rios. Flannery's explanation that newswriters were hired despite the fact they did not meet the qualifications due to the extraordinary circumstances of the time, is insufficient as the time period referred to was 1981–1982, when ABC Radio was adding two additional networks and, therefore, does not encompass the entire period during which plaintiff complains of discrimination.

For all the foregoing reasons, defendants' Motion for summary judgment is granted as to plaintiffs Hope and Gibson

and is denied as to plaintiff Rios. Defendants' Motion for attorneys' fees is denied.

Counsel for the parties are directed to appear for a status conference on May 19, 1988, at 9:30 a.m., Room 414, U.S. District Courthouse, Foley Square, New York, New York.

SO ORDERED.